Peter J. MURRAY and Virginia M. Murray, Appellants,

v.

Everett FEIGHT and Martha Feight, Appellees.

No. S–1378.

Supreme Court of Alaska.

Aug. 14, 1987.

1150

Warren C. Christianson, Sitka, Drew Peterson, Anchorage, Cathy Vertrees-Canorro, Canorro & Vertrees-Canorro, Seattle, Wash., for appellants.

Richard H. Friedman, Sitka, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

This appeal is from a $1,296,000 verdict entered against Peter and Virginia Murray after a jury trial. It involves a dispute between sublessors (the Murrays) and sublessees (the Feights). The Murrays challenge the superior court's granting of partial summary judgment to the Feights precluding relitigation of an issue resolved in a previous lawsuit between the Murrays and a third party. The Murrays did not appear at the trial below. They nonetheless raise several instances of procedural error and challenge the verdict as unsupported by the evidence. As modified, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1979 Everett and Martha Feight entered an agreement with Peter and Virginia Murray to buy a television, stereo and record business in Sitka. The $52,000 agreed-upon purchase price included inventory, store fixtures and rights to television and stereo franchises. The Feights also subleased the store premises from the Murrays, and continued to operate the business under the name "Murray TV and Sound."

In the spring of 1982, the Feights decided to sell the store and move to Wyoming. As of June 1982, the Feights had approximately six months of store payments remaining. Although the store lease was to expire before the six months, the Feights had the option to renew it.

Everett Feight testified that he told Peter Murray that the Feights were trying to sell the store and wanted to renew the lease. Murray responded that this would not be a problem.

In early June, 1982 Martha Feight and the Feight's 18-month old daughter, Nicole, left for Wyoming. Everett planned to stay in Sitka until the store was sold. If they were unable to sell the store, and were forced to liquidate their inventory, Everett estimated they would have been about $5,000 in debt.

Later that day Everett learned that his daughter had died. He gave his lawyer a power of attorney and the key to the store and left to join his wife. At this time, the Feights owed the Murrays between $2,500 and $3,000 in back rent.

Two days after Nicole's death, the Feights' attorney, Richard Friedman, was at the store when he was summoned to the door by Peter Murray and the Murrays' attorney, Ed Stahla. Murray pushed by Friedman to gain entry and informed him that they were taking possession of the store and changing the locks. No prior notice had been given of the Murrays' intent to repossess, as required by the lease.

A woman who was then employed by Ed Stahla testified that she had informed Stahla the day before the repossession of Nicole's death. At the store, Stahla and Murray were told that Nicole had died while flying south, and that this was the reason Everett Feight had left. Murray nonetheless proceeded to take possession of the store and all its contents, including such property as the Feights' personal records, tax returns and photographs, none of which were returned.

Two days after the repossession, a lawsuit was filed by Borg-Warner Acceptance Corporation (BW) against "Murray TV & Sound, Inc." and Everett and Martha Feight. BW claimed the Feights owed it $20,642.81 and that this amount was secured by the store inventory. The Feights did not contest the debt. They were willing to turn back the property to BW but were prevented from doing so because the Murrays had possession.

Eventually, the Feights were dismissed from the *BW* suit and, by stipulation, the Murrays were added as defendants. The

Murrays asserted a common law landlord lien on the store inventory for back rent. The main issue in the *BW* action, therefore, became the validity and priority of the respective parties' liens. A discovery dispute arose when Peter Murray, on advice of counsel, refused to answer deposition questions about whether the re-entry was accomplished with the Feights' consent. Murray asserted that the issue of consent was irrelevant. The court disagreed, ordered Murray to answer and gave the parties opportunity to supplement their briefing regarding BW's pending summary judgment motion which urged that the Murrays' lien was invalid and that BW's lien had priority in any event.

BW's motion for summary judgment was granted. The court found that BW had a valid lien secured by properly recorded financing statements. The court then found that the Murrays did not have a valid common law landlord lien. The court found that the re-entry was intended to distrain and terminate the lease and that AS 09.45.-690, as interpreted by this court, provided the only legal means to terminate a landlord-tenant relationship, absent a specific lease provision. Since the Murrays had neither complied with the statute nor with the 30–day notice provision of the lease, the court concluded they had no valid lien.

The Murrays' motion to reconsider was denied, and judgment for BW was entered December 16, 1983. The Murrays appealed this judgment, but the appeal was subsequently dismissed by stipulation of the parties.

Before the Murrays dismissed their appeal in *BW*, the Feights filed the instant action, claiming breach of contract, conversion and intentional infliction of emotional distress. In their answer, the Murrays claimed as an affirmative defense that the Feights' attorney had consented to the re-entry.

The Feights then moved for partial summary judgment, urging that the Murrays should be collaterally estopped from relitigating issues resolved against them in the *BW* action. Specifically, they urged that the following findings made by the court in

*BW* be held to bind the Murrays in this case:

5. That the sublease itself contained specific provisions for termination and reentry for failure to comply with the sublease terms.

6. That the provisions for termination and re-entry did not include a provision entitling termination by distraining tenants' property.

7. That on June 9, 1982 the Murrays sought to terminate the landlord and tenant agreement by forcibly entering the leased premises.

8. That the entry on June 9, 1982 was in violation of the sublease agreement and that termination was attempted without complying with either the terms of the sublease or AS 09.45.690.

The trial court granted the Feights' motion. After this ruling, the Murrays' attorneys, Christianson & Stahla, received permission from the court to withdraw as attorneys of record. From that point on, the Murrays essentially ignored the case. They failed to appear for their depositions. Peter Murray hung up on the trial court's clerk who was attempting to arrange a telephonic pre-trial status conference, and neither the Murrays nor anyone representing them appeared at the trial.

The Feights proceeded to present their case to a six-person jury which returned a verdict for the Feights as follows:

$15,000 for breach of contract;

$50,000 for other financial losses resulting from breach of the lease;

$31,000 for property taken from the store;

$150,000 *each* to Everett and Martha Feight for mental and emotional distress resulting from interference with chattels;

$200,000 *each* to Everett and Martha Feight for mental or emotional injury "as a result of the Murrays' action";

$250,000 *each* against Peter and Virginia Murray for punitive damages.

The court also awarded prejudgment interest of $292,530 and attorney's fees of $158,853 for a total judgment of $1,747,383.

The Murrays failed to file any post-trial motions attacking the judgment.

Eventually the Murrays retained counsel to handle their appeal, which was timely filed. On appeal, they claim that the trial court erred in granting the Feights' motion for partial summary judgment based on collateral estoppel. They also assert that the following errors occurred at trial: 1) the court failed to dismiss a juror whose father owned the premises which the Murrays sublet to the Feights; 2) the court admitted prejudicial evidence of no probative value; 3) there was not substantial evidence to support the jury's award of punitive damages; 4) the jury's answers to Interrogatories 1 through 12 were not supported by a preponderance of the evidence; and 5) the court erred in allowing Richard Friedman to continue to represent the Feights once it appeared that he was a material witness.

## II. DISCUSSION

### A. COLLATERAL ESTOPPEL.

The Murrays contend that the trial court should not have applied the doctrine of collateral estoppel, barring them from relitigating issues resolved in the *BW* action.

■ The following circumstances must exist before a court can properly apply the doctrine:

 1. The plea of collateral estoppel must be asserted against a party or one in privity with a party to the first action;

 2. The issue to be precluded from relitigation by operation of the doctrine must be identical to that decided in the first action;

 3. The issue in the first action must have been resolved by a final judgment on the merits.

*See Pennington v. Snow,* 471 P.2d 370, 377 (Alaska 1970), *citing Bernhard v. Bank of America,* 19 Cal.2d 807, 122 P.2d 892, 894–95 (1942). In *Pennington,* we abandoned the additional common law mutuality requirement that collateral estoppel could be used only *by* one who was a party to the first action. 471 P.2d at 377. Instead we

determined to allow use of non-mutual collateral estoppel so long as there were no unusual or exceptional factors in the prior adjudication which would warrant the application of the mutuality requirement. If the particular circumstances of the prior adjudication would make it unfair to allow a person who was not a party to the first judgment to invoke res judicata or collateral estoppel, then the requirement of mutuality must still be applied. *Id.*

On appeal, the Murrays do not contest that the three above-listed prerequisites to application of collateral estoppel are present in this case. Instead, they raise several arguments which can be generally characterized as going to the question whether it is fair to allow the Feights, who were not parties in *BW,* to use rulings from that case against the Murrays here.

The Murrays argue that they did not receive a full and fair hearing on the issue of consent in the *BW* action, that the Feights should have brought their present claim in *BW,* that it was not foreseeable that the Feights would bring the instant action, that giving collateral estoppel effect to the *BW* judgment is unfair because the standard of proof on the consent issue is different here than it was in *BW,* and that the dollar amount at stake in *BW* was significantly less than that involved here such that it is unfair to bind them to the prior adjudication. We find none of these arguments persuasive.

 1. Full and Fair Opportunity to Litigate The Consent Issue in *Borg-Warner.*

■ The Murrays contend that although the *BW* action lasted one and a half years and produced an extensive record, the issue of consent in fact received little attention. The rule is that to be given collateral estoppel effect, an issue must have been actually and fully litigated in the first action. This rule, however,

does not refer to the quality or quantity of argument or evidence addressed to an issue. It requires only two things: first, that the issue has been effectively raised in the prior action, either in the pleadings

or through development of the evidence argued at trial or on motion; and second, that the losing party has had "a fair opportunity procedurally, substantively, and evidentially" to contest the issue. *Overseas Motors, Inc. v. Import Motors Ltd., Inc.*, 375 F.Supp. 499, 516 (E.D.Mich. 1974) (footnotes omitted), *aff'd*, 519 F.2d 119 (6th Cir.1975) (appellate court did not reach collateral estoppel issue because evidence excluded by lower court on collateral estoppel ground would not have altered the result), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975).

The issue of consent was plainly raised from the first day of the *BW* action. A hearing was held that day at which the Feights' attorney claimed the Murrays were trespassing and the Murrays' attorney responded that the Feights had consented to the re-entry. Moreover, the superior court ruled that the issue of consent was relevant to the validity of the Murrays' claimed lien.[1]

In opposing *BW*'s motion to compel, the Murrays themselves acknowledged that consent might operate to cure any defect in the manner in which the repossession was effected. On appeal, the Murrays do not argue that they were in any way prevented from presenting evidence on the consent issue. In fact, in their motion for reconsideration of the grant of summary judgment in *BW*, they introduced deposition testimony of Peter Murray about the repossession. The *BW* court found that this testimony, which can best be characterized as evasive and ambiguous, did not create an issue of fact and denied the motion for reconsideration. The consent issue was, therefore, "actually adjudicated," and may properly support a claim of collateral estoppel. *Pal-*

*fy v. First Bank of Valdez*, 471 P.2d 379, 384 (Alaska 1970).

In the context of giving collateral estoppel effect to a default judgment, one court reasoned, "The law cannot force a party to make the best case possible or even any case at all, it only permits him to do so, prompted by his own self-interest." *Overseas Motors, Inc.*, 375 F.Supp. at 516 n. 49.[2] The Murrays received a full and fair hearing on the issue of consent in *BW*.

2. The Feights' Claim Need Not Have Been Brought in the *BW* Action.

■ The Murrays argue that the Feights could have brought their claims in the *BW* action so that it is unfair to allow them to assert collateral estoppel here. The Murrays rely on Restatement (Second) of Judgments, § 29(3) (1983) and particularly comment e to that section, which states:

A person in such a position that he might ordinarily have been expected to join as a plaintiff in the first action, but who did not do so, may be refused the benefits of "offensive" issue preclusion where the circumstances suggest that he wished to avail himself of the benefits of a favorable outcome without incurring the risk of an unfavorable one. Such a refusal may be appropriate where the person could reasonably have been expected to intervene in the prior action, and ordinarily is appropriate where he withdrew from an action to which he had been a party.

The circumstances of this case, however, are not ordinary. As the lower court found, the Feights' tort and contract claims were "entirely foreign to the nature of the original case," i.e., priority of the respective liens. Moreover, the Feights' baby daughter had just died. It is completely

---

1. This ruling was made in the context of a discovery dispute over whether Peter Murray should be required to answer deposition questions concerning whether the re-entry was made with consent and thus the court was applying the generous relevance standard applicable to the discovery stage. Alaska R.Civ.P. 26(b)(1); *Doe v. Superior Court*, 721 P.2d 617, 620–21 (Alaska 1986). The ruling nonetheless put the Murrays on notice that the court considered

consent to be relevant to the question whether their lien was valid.

2. Along with their reply brief, the Murrays filed additional evidence that they did not introduce in *BW* in support of their argument that they should be allowed another opportunity to litigate. They offer no explanation as to *why* this evidence was not there introduced. It does not affect the conclusion that they had a full opportunity to litigate.

understandable that the Feights chose not to begin major litigation at that time. There is simply no evidence that they were lying in wait, hoping to exploit a favorable judgment with no risk of being bound by an unfavorable one. The fact that they originally were parties does not in this case require the conclusion that application of collateral estoppel was inappropriate.

### 3. Foreseeability of the Feights' Action.

■ Whether the party against whom preclusion is asserted could have foreseen the second action is a factor courts should consider in deciding whether to give collateral estoppel effect to a prior adjudication. Restatement (Second) of Judgments § 28(5)(b) (1981). The Feights' action was clearly foreseeable in that the Murrays voluntarily dismissed their appeal in the *BW* action some six months *after* the Feights filed their lawsuit. They cannot, therefore, claim that the filing of the Feights' action was unforeseeable.

Moreover, the Murrays themselves had raised the issue of consent as an answer and affirmative defense in the *Feight* action *before* their attorney executed the stipulation requesting dismissal of their appeal in *BW*. The Murrays' claim that the issue of consent in the context of the Feights' lawsuit was unforeseeable is wholly without merit.

### 4. Differing Standards of Proof.

■ The Murrays assert that collateral estoppel is inappropriate because they had a heavier burden of proof in *BW* than they do in this case. They are correct in asserting that one factor courts can consider in determining the fairness of issue preclusion is whether the party to be precluded has a better chance of prevailing in the subsequent action because he bears a lesser burden of proof than in the first action. Restatement (Second) of Judgments § 28(4) (1981). It is also true that in *BW* the

Murrays had the burden of proving the validity of their landlord lien as an affirmative defense. *Morrow v. New Moon Homes, Inc.,* 548 P.2d 279, 294 (Alaska 1976), *declined to follow on other grounds by East River S.S. Corp. v. Transamerica Delaval, Inc.,* —— U.S. ——, 106 S.Ct. 2295, 90 L.Ed.2d 865, 876 (1986). In this case, the Feights claim that the re-entry was forcible. The Murrays assert that the re-entry was with consent. Although they also designate consent as an affirmative defense, this does not change the fact that the assertion of consent "raises no new matter but simply denies the existence of one of the elements in plaintiff's case." *Id.* at 295. As such, consent is an issue regarding which the Feights have the ultimate burden of proof. *Id.*

Nonetheless, the burden the Murrays failed to meet in the *BW* action was not their ultimate burden of proof. Rather, the issue of consent was resolved on a motion for summary judgment.[3] All inferences of fact were to be drawn in the Murrays' favor as the non-moving party.[4] *Alaska Rent-A-Car v. Ford Motor Co.,* 526 P.2d 1136, 1139 (Alaska 1974); Alaska R.Civ.P. 56(c). All the Murrays had to do to defeat BW's motion was "to set forth specific facts showing that [they] could produce evidence reasonably tending to dispute or contradict the movant's evidence and thus demonstrate that a material issue of fact exist[ed]." *State, Dept. of Highways v. Green,* 586 P.2d 595, 606 n. 32 (Alaska 1978). The Murrays were not required to establish that they would ultimately have prevailed at trial. *Alaska Rent-A-Car, Inc.,* 526 P.2d at 1139; *Gablick v. Wolfe,* 469 P.2d 391, 395 (Alaska 1970). Thus if anything, the Murrays' burden in *BW* was less than the burden they face here.

■ The Murrays apparently claim that the issue of consent was not raised in such a way that they had an opportunity to

---

**3.** It is clear that collateral estoppel effect may properly be given to a summary judgment; full trial on the merits is not required. *Stevenson v. Sears Roebuck & Co.,* 713 F.2d 705, 712 (Fed.Cir. 1983).

**4.** The Murrays in fact filed a cross motion for summary judgment but this should not have effected the court's approach to determining whether to grant BW's motion.

respond. This argument is patently absurd. Admittedly, the key evidence on lack of consent—Richard Friedman's affidavit describing the re-entry—was filed several months after BW had filed its reply brief in support of its summary judgment motion. But the Friedman affidavit was filed almost a month before the court ruled on the motion. The Murrays do not contend that they were in any way prevented from filing a responding affidavit, which presumably could have been executed by either Ed Stahla or Peter Murray since both were present at the re-entry. The Murrays do not claim, nor is it plausible that they could claim, that the trial court would have prohibited them from filing such an affidavit after it had allowed BW to file the Friedman affidavit.

In their motion for reconsideration in *BW*, the Murrays apparently asserted that portions of Peter Murray's deposition contradicted Friedman's affidavit, creating a disputed issue of material fact sufficient to defeat summary judgment. Mr. Murray's deposition testimony can best be characterized as evasive and says in essence that Murray told Friedman he was changing the locks and the rest could be settled in court and that Friedman did not actively prevent them from changing the locks. The trial court correctly found that this ambiguous testimony did not raise a genuine issue of material fact.

The Murrays had a more than adequate opportunity to present evidence to meet their comparatively light burden of establishing a question of fact in *BW*. Their burden here, if anything, is heavier. Thus, the differing burdens of proof factor weighs in favor of, not against application of collateral estoppel.

5. Relatively Small Dollar Amount at Stake in *BW*.

◼ Another factor courts will consider in determining the appropriateness of preclusion is whether the dollar amount at stake in the first action was so small that the party to be precluded may not have had

incentive to litigate the issue in the prior action fully and it would be unfair to bind the party to that adjudication in a case in which a substantially greater dollar amount is involved. Restatement (Second) of Judgments § 28(5)(c) (1981). We found this factor to be of particular importance in *Pennington v. Snow*, 471 P.2d 370, 378 (Alaska 1970). This is indeed the Murrays' strongest argument; the *BW* action involved only $3,000,[5] while the verdict here was approximately $1.3 million. The difference in relative dollar amounts at stake is substantial. On the other hand, the justification underlying this consideration is that the party to be precluded may not have had incentive to litigate the issue to the fullest in the prior action. *Id.* at 378. There is every indication that the Murrays went all out in their battle against BW. The only thing the Murrays assert they would have done differently if more were at stake would have been to pursue the appeal. But at the time they dismissed their appeal the *Feight* action had been filed and the Murrays themselves had already raised the consent issue. This would seem more than adequate incentive to pursue the appeal.

Each of these factors thus weighs in favor of preclusion in this case and we affirm the grant of partial summary judgment.

## B. TRIAL ISSUES.

### 1. Standard of Review.

◼ The trial court found that the Murrays received repeated notice of the trial date, based on calls made by the court clerk and statements of process servers. The Murrays do not contest that they received notice. Nonetheless, neither they nor a representative appeared at trial.

Since they obviously raised no objections at trial, any errors the Murrays now claim will be reviewed only if they constitute plain error. *Miller v. Sears*, 636 P.2d 1183, 1189 (Alaska 1981); *City of Nome v. Ailak*, 570 P.2d 162, 171 (Alaska 1977). "Plain

---

**5.** This is the amount the Feights owed in back rent at the time and is the maximum the Mur-

rays could claim on their common law landlord lien for back rent.

error exists where an obvious mistake has been made which creates a high likelihood that injustice has resulted." *Miller*, 636 P.2d at 1189; *see also Harned v. Dura Corporation*, 665 P.2d 5, 7 (Alaska 1983). The Murrays apparently concede that plain error is the appropriate standard of review.

### 2. Failure to Dismiss Juror Joanna Baughn.

▮ The Murrays claim that the trial court committed plain error when it failed to dismiss Joanna Baughn from the jury because her father, Stumpy Baughn, owned the building in which the store the Murrays sublet to the Feights was located. In our view, Stumpy Baughn's financial interest in the outcome of this action is not "obvious," contrary to the Murrays' position. The dispute here was between the Feights and the Murrays on the sublease. Whether the Feights paid their rent to the Murrays presumably has no impact on the Murrays' obligation to pay rent to Stumpy Baughn.

Moreover, Ms. Baughn stated on voir dire that she had heard nothing about the case from her father. Contrary to the Murrays' assertion, this is hardly the kind of exposure to such incriminating or highly inflammatory material that requires automatic disqualification of a potential juror. *Cf. Chase v. State*, 678 P.2d 1347, 1352 (Alaska App.1984) (addressing the effect of pretrial publicity on juror panel in a sexual assault case).

The court's failure to dismiss juror Baughn was not plain error.

### 3. Admission of Allegedly Prejudicial Evidence.

#### a. *Evidence that Virginia Murray was in Sitka the day before the trial.*

The Murrays claim that testimony of an Alaska Airline's employee indicating that Virginia Murray was on a flight which stopped over in Sitka the day before the trial should not have been admitted. They claim this evidence was irrelevant and was presented solely for the purpose of inflaming the jury.

▮ While the evidence was not relevant to any issue before the jury, we find that Jury Instruction No. 2 cured any plain error. The jury was instructed as follows:

As you can see, the defendants in this case, Peter and Virginia Murray, are not present here today. The fact that they are not here does not mean that they have admitted any element of the plaintiffs' case, whether related to liability or damages. You must critically view the evidence and the instructions I give you before making any factual findings. You may not draw any factual or legal conclusions from the Murrays' absence. On the other hand, you should be aware that the Murrays have been repeatedly advised of the trial date and, in fact, Peter Murray has been ordered by me to attend. They are entitled to no special consideration from you as a result of their refusal to attend.

#### b. *Photographs of the Parties' Respective Residences.*

The Murrays claim photographs of their house and the Feights' Wyoming mobile home were highly prejudicial, irrelevant and should not have been admitted.

▮ The Feights' response is persuasive:

One factor the jury was required to consider in awarding punitive damages was the wealth of the Murrays. *E.g., Clary Ins. Agcy. v. Doyle*, 620 P.2d 194, 205 (Alaska 1980). The Murrays' failure to respond to court-ordered discovery relating to wealth substantially hampered the Feights' ability to introduce evidence as to this factor. The photograph of the Murrays' home was relevant to the issue of wealth, as was the fact that Mrs. Murray had recently traveled to Juneau from Seattle first class.

Moreover, the Murrays' absence from trial made it impossible for the Feights to elicit trial testimony from the Murrays concerning their wealth. As to the Feights' trailer, this evidence is relevant to the Feights' claim that they have been in difficult financial circumstances since the re-entry of their store.

It was not plain error for the court to admit this evidence.

### c. *Evidence of Nicole's Death.*

■ There was evidence that the Murrays' attorney, Ed Stahla, was aware of Nicole's death before the repossession of the store. A woman employed by Stahla at the time testified that she had informed him of Nicole's death the day before the re-entry. Also, the two policemen who were present at the lockout testified that the subject of Nicole's death came up as the reason for Everett Feight's absence. This evidence is sufficient to support a finding that Peter Murray knew of the Feights' tragedy but proceeded nonetheless to repossess the store. Such evidence was crucial to the Feights' claim of intentional infliction of emotional distress and for punitive damages. It was not plain error to admit this testimony.

### 4. Punitive Damages.

■ The Murrays challenge the award of punitive damages on several grounds. First, they claim the award cannot stand because the jury did not expressly find that the Murrays acted maliciously. But the jury was instructed, in accordance with *Alaska Pattern Civil Jury Instruction* 20.20, that they could award punitive damages *"only* if you decide it is more likely than not that.... [t]he Murrays' actions were the result of maliciousness or hostile feelings toward the Feights, or were undertaken with reckless indifference to the interests, rights, or safety of others." (Emphasis supplied). Thus, implicit in the jury's award of punitive damages is its finding that the Murrays acted maliciously or recklessly. The Murrays' first point is thus without merit. *Cf. Alaska Bussell Elec. v. Vern Hickel Const.*, 688 P.2d 576, 581 (Alaska 1984) ("[I]t is not error [for the court] to refuse to submit a question or instruction where the issue is adequately covered by other questions or instructions.").

■ Second, the Murrays claim that it was plain error for the court to instruct the jury on punitive damages at all. This argument is likewise without merit. We have expressly approved punitive damage awards in wrongful repossession cases. *Alaska Statebank v. Fairco*, 674 P.2d 288, 296 (Alaska 1983). There was evidence in the record from which the jury could conclude that the Murrays took advantage of Everett Feight's absence, which Peter Murray knew was due to Nicole Feight's death, to re-enter the store with no prior notice and distrain the Feights' property. Such a finding would indicate at the very least that Peter Murray acted in reckless disregard to the Feights' rights and would support the punitive damages award. *Id.* It was not plain error for the court to instruct the jury on punitive damages.

■ Third, the Murrays claim that evidence of Nicole's death and its effect on the Feights was improperly admitted. As discussed above, that the repossession was done with knowledge of Nicole's recent death was crucial to the Feights' emotional distress and punitive damages claims. Testimony regarding the effect of Nicole's death on her parents was also necessary in order to separate what distress was caused by the death and to what extent the repossession added to that distress. It was not plain error to admit this evidence.

The Murrays make an additional argument that is difficult to discern. In disputing the award of punitive damages against Virginia Murray, they claim the court erred in giving "Instruction No. 26 when there was no finding that an agency, joint venture[,] partnership ... existed between" the Murrays. But Instruction No. 26 is taken from the pattern instruction to be given when the jury must decide whether a non-acting partner should be held responsible for the acting partner's conduct. *See* Alaska Pattern Civil Jury Instruction No. 23.08.

The jury was instructed as follows:

Much of the testimony in this case has related to the actions of Peter Murray. If you find that these actions demonstrate that Mr. Murray should be liable for the intentional infliction of emotional distress, Virginia Murray may also be liable on this claim. Virginia Murray is

liable if four things are true. You must decide whether they all are more likely than not true. The four are as follows:

1. Virginia and Peter Murray agreed to work together in a business in which each would share profits and losses, and,

2. Virginia and Peter Murray each contributed property, money, knowledge, skills, services, or something else that would help the business, and,

3. Virginia and Peter Murray each had the right to some voice in the direction and control of the business activities, whether or not they exercised this right, and,

4. The actions which demonstrate that Mr. Murray should be liable for intentional infliction of emotional distress were either agreed to by Virginia Murray, or were done during the ordinary course of the business in which they were working together.

If you decide that all four of these things are more likely than not true, then the law holds Virginia Murray responsible for the actions of Peter Murray. If you decide otherwise, Virginia Murray is not legally responsible for the actions of Peter Murray.

In deciding these issues, you should be aware that in the pleadings in this case, Virginia Murray has admitted to being a party to the lease agreement, to changing the locks on the store, and to taking certain personal property located within the store.

The jury expressly found Virginia Murray to be jointly responsible for the acts of her husband and thus found each of the above-listed four factors more likely than not to exist.

While the evidence of Virginia's conduct would not alone support an award of punitive damages against her, the law will in certain circumstances hold a party vicariously liable for punitive damages based on the act of another. *Alaskan Village, Inc. v. Smalley*, 720 P.2d 945, 949 & n. 4 (Alaska 1986).

In *Alaskan Village* we adopted the rule that an employer is liable for punitive damages if the actions of the employee subject the employer to liability for compensatory damages and the employee acted maliciously or recklessly. *Id.* All evidence suggests, and the jury expressly so found, that Peter was acting for Virginia as well as for himself in dealing with the Feights. Virginia's vicarious liability for compensatory damages is therefore clear. *Miller v. Sears*, 636 P.2d 1183, 1191 (Alaska 1981) (wife held vicariously liable for actions of husband in negotiating the sale of the couple's house). The jury implicitly found Peter's conduct to warrant punitive damages. Under the reasoning of *Alaskan Village*, which the Murrays do not challenge, the jury could properly find Virginia also liable for punitive damages, and did so. We refuse to disturb this award.

5. Support for Jury's Interrogatory Responses.

The Murrays assert that the jury's interrogatory responses were not supported by the evidence. Most of these arguments are meritless. Counsel for the Feights conceded at oral argument, however, that the $50,000 figure the jury awarded for financial losses other than income from the store included the $31,000 it awarded for property the Murrays took from the store. To avoid a double recovery, therefore, the total verdict must be reduced by $31,000.

Although not addressed by the parties we observe another instance of double recovery which plainly appears on the special verdict form. Under the heading "Interference with Chattels," the following interrogatories and answers appear:

5. If you find that mental and emotional distress was the direct and natural result of the Murrays' interference with this property, what amount of money would fairly compensate Everett Feight for this injury?

$150,000

6. If you find that mental and emotional distress was the direct and natural result of the Murrays' interference with this property, what amount of money

would fairly compensate Martha Feight for this injury?

$150,000

Under the heading "Intentional Infliction of Emotional Distress," the following interrogatories and answers appear:

9. If you find it more likely than not that Everett Feight suffered mental or emotional injury or distress *as a result of the Murrays' actions*, what amount of money would fairly compensate him for this injury?

$200,000

10. If you find it more likely than not that Martha Feight suffered mental or emotional injury or distress *as a result of the Murrays' actions*, what amount of money would fairly compensate her for this injury?

$200,000

(Emphasis added).

Nowhere is the phrase "as a result of the Murrays' actions" in interrogatories 9 and 10 limited so as to exclude interference with chattels for which damages were awarded in response to interrogatories 5 and 6. Neither interrogatories 9 and 10 nor any jury instruction that was given indicate that if the jury were to award a separate amount of damages for emotional distress resulting from interference with chattels, it had to exclude that amount from any award of damages for emotional distress generally. Indeed, the jurors were instructed that they "may consider all of the surrounding circumstances" in evaluating whether the Murrays were liable for intentional infliction of emotional distress.

It thus appears that the emotional distress awards amount to a double recovery. The general award for emotional distress, totalling $400,000, will stand but the award for emotional distress resulting from interference with chattels, totalling $300,000, must be overturned as subsumed in the $400,000 general award.

6. Obviously, the award might well have been substantially lower had the Murrays chosen to

6. No Error Resulted from Richard Friedman's Continued Representation of the Feights.

 The Murrays contend that the Feights' attorney, Richard Friedman, should have refused to represent the Feights in this action since he was an eye witness to the store repossession. Alaska Code of Professional Responsibility Disciplinary Rule 5–101(B) requires an attorney to refuse employment "in contemplated or pending litigation *if he knows or it is obvious* that he ... ought to be called as a witness." The Murrays lost the consent issue in the *BW* action before this suit was filed. It was then highly probable that the Murrays would be collaterally estopped from relitigating the issue in this case and Friedman's testimony would not be necessary. It was therefore not obvious that Friedman ought to be called as a witness. We find no reversible error on this point.

7. The Damages Awarded Were Not Excessive.

 Since the Murrays did not raise the issue of excessive damages in a motion for remittitur or new trial, we may refuse to review the issue or we may, in our discretion, review the award to ascertain whether it is so excessive "as to amount to a miscarriage of justice." *Heacock v. Town,* 419 P.2d 622, 624 (Alaska 1966). The evidence before the jury, which as discussed above, was properly admitted, supports a conclusion that the Murrays took advantage of the Feights' absence, knowing that the absence was due to their daughter's death, to forcibly repossess the store premises and its contents, obviously jeopardizing the Feights' attempts to sell the store, of which the Murrays also were aware, and causing the Feights severe financial hardship, which was clearly foreseeable. Given such a view of the case, we do not believe the amount awarded is so excessive as to constitute a miscarriage of justice.[6]

appear and present their side of the story.

### III. CONCLUSION

The trial court correctly precluded the Murrays from relitigating the question whether the re-entry of the Feights' store was with consent. We find plain error on only two elements of the award, requiring a reduction of the judgment by $331,000 to avoid a double recovery. The remainder of the verdict is adequately supported by evidence that was properly presented to the jury and is affirmed.

AFFIRMED in part and REMANDED in part for modification consistent with this opinion.