**TEAMSTERS LOCAL 959, Appellant,**

v.

**Arlo Lloyd WELLS, Appellee.**

**No. S–1766.**

Supreme Court of Alaska.

Jan. 22, 1988.

---

Stephen R. Porter, Anchorage, for appellant.

Millard F. Ingraham, Millard F. Ingraham, PC, Anchorage, and Kennelly, Azar, and Donohue, PC, Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

## I. FACTS AND PROCEEDINGS.

### A. *Facts.*

At the time Teamsters Local 959 (Local or Local 959) went on strike against the

Odom Company (Odom) in June 1981, Arlo Wells was a member of the Local; his wife, Donna Wells, was employed at Odom. She was a supervisor. He was a union truck driver working with K & W Trucking.

Soon after the strike against Odom began, Bruce Dove, a Local 959 business representative, contacted Arlo about Donna, who was operating a forklift in the Odom warehouse. Dove told Arlo that she should not be operating the forklift because it was a union job. Arlo in turn told Donna that she should not drive the forklift because it was a union job. Although upset, she agreed not to operate the forklift while the doors of the Odom warehouse were open.

On October 27, 1981, Local 959 went on strike against K & W. Arlo voted in favor of going on strike and picketed K & W during the strike. While Wells was picketing K & W, Rick Sierer, another Local 959 business representative, asked Wells why he had not been picketing Odom.[1] Wells responded that he did not have the time; Sierer told Wells he would have to make up the time.

On October 30, 1981, a message was sent through Wells' picket captain that he was to meet Sierer at Sierer's office in the Teamster Building. Present at the meeting were Sierer, Wells, and a man named "Jack." Sierer told Wells that the union needed all the help it could get to win the Odom strike, asked him about the picketing he had not done, and told him that Donna should either quit her job or provide him with freight information, which he could in turn provide to the union. Arlo related this conversation to Donna and asked her if she could give him the information. Donna, angered by the suggestion, told him she would not give him or anybody else such information.

On October 31, 1981, Arlo and Donna went to the Fairbanks airport to pick up Jay Dougherty, an Odom employee. When they got into their car the Wellses noticed "someone writing something down like he was taking [their] license down." Dough-

erty spoke to the man who told him that he knew who Arlo, Donna, and Dougherty were and where they lived. He identified himself as a Teamster. The man followed them to their neighborhood, where they dropped Dougherty off.

Wells next had contact with the union on November 3, 1981, when he was told by his picket captain to see Sierer at his office. Wells met with Sierer and Jack. Sierer asked Wells why he failed to inform the union about his conversation with Dougherty at the airport. Wells responded that the only information he gave Dougherty was what everyone had already read in the newspapers. Sierer told Wells he did not believe that Wells did not have information about Odom from conversations with his wife. Jack told Wells that if he "was the man of the house" he would have gotten the union the information. Sierer asked Wells if he knew Odom's stock level in its Fairbanks warehouse, whether Odom had another warehouse and its location, and if he knew of any shipments that were coming in or what Odom's shipments were. He told Sierer he did not know. Sierer again asked Wells to have Donna either quit her job or give the union information. Wells, with Jack present, again asked Donna for the information.

On November 6, 1981, Sierer once again told Wells that he wanted Donna to quit her job. He said that the union would find her another one. When Arlo discussed this with Donna, she became angry at him for bringing the union's demands home, and told him she liked her job and did not want to quit.

Three days later Arlo received a call from Sierer stating that he wanted to see him, but when Wells arrived for the meeting, Sierer was not there. Later that day Sierer told him to see him the next morning. At the next day's meeting, Sierer apologized for putting so much pressure on Wells and asked him to meet with a business agent about finding Donna a job with Alascom. Wells told Donna about the con-

---

1. Teamster members, including Arlo, were required to picket Odom for two hours a week. Arlo did not picket Odom initially because he was too busy; the union took no action against him for his failure to picket until contacted by Sierer.

versation; she responded that she did not want a job at Alascom.

On November 12, Sierer asked Wells to come to his office, where they met alone. Sierer told him that he wanted Donna either to quit or to take a 30–day leave of absence, because the strike would be over within 30 days. He also stated that the union would not get Donna a job at Alascom because it was not the union's job to get jobs for non-union people. He told Wells that if Donna did not quit or take a leave of absence, the union would come down hard on him and he knew what it meant when the union comes down hard on people. Sierer told him that this directive came from the main office in Anchorage and mentioned John Forceskie and Mike McKenna, both from the Anchorage office. He then told him, "This is not a threat but your life is not worth your wife's wages and your wife better not show up to work the next morning."

After the meeting Wells returned to the K & W picket line and then went home. He called his wife, who testified that he sounded shook up, to tell her about the threat. Wells was upset and scared.[2]

Donna went to work the next day. But Wells, fearing for her safety, contacted one of Donna's co-workers to give her a ride because he did not want her to be recognized driving her own vehicle. Donna contacted Odom's labor consultant, and asked him for advice. The labor consultant advised her that Arlo should file a complaint with the National Labor Relations Board (NLRB). Donna arranged for Arlo to go to the union hall with a lawyer to withdraw his union membership. Arlo took a lawyer with him because he "was afraid ... after being threatened." He went to the Teamster Hall and started the process to with-

draw his membership.[3] Donna, in the meantime, reported the incident to the police.

Over the following weekend Wells was "very upset" and "afraid." He left Fairbanks on Monday, November 16, 1981, because he "was afraid for [his] life" and wanted to file a complaint with the NLRB regarding the threat on his life.

Wells knew of the violence associated with the strike from conversations with Donna, Lew Hahn (Donna's co-worker), and Bill Brown, an Odom salesman. Donna told him that bullet holes were found in the warehouse doors, and tires were flattened in front of the warehouse daily. Brown told Wells of personal threats by Teamster drivers. Hahn told him of numerous incidents of violence that had occurred to him and his property.[4]

After filing his complaint and affidavit with the NLRB in Seattle, he remained outside the state until he returned to Fairbanks on December 16, 1981. He formally resigned from the union in February, 1982.

In March 1982, Arlo went back to work for K & W, crossing the Teamster picket line. From March until October, 1982, he made the same hourly wages as a union truck driver would have made prior to the strike. After 1982 Wells became an independent contractor to K & W, receiving gross receipts of $79,869, $88,646, and $101,000, in 1983, 1984, and 1985, respectively. He has never attempted to rejoin the Teamsters. If he returned to work with the union by 1993, he would need to work 1,000 hours in a two-year period to become vested.

### B. *Proceedings.*

In his complaint Wells asserted separate claims for assault, intentional infliction of

---

**2.** He had heard about windows, doors, and vehicles being shot and tires being slashed because of the Odom strike.

**3.** Gary Atwood, a Local 959 business manager, testified that he talked to Wells and Wells told him that he was withdrawing because of marital problems and that he seemed calm.

**4.** Hahn reported Molotov cocktails thrown at the vehicles in his driveway; receiving a phone

call from a man who said: "The next time it's going to be you;" the shooting of a bullet through his picture window; the slashing of his tires; the shooting of the windows of his pickup with a slingshot; bullet holes in his pickup door; and eight bullet holes in his home. These incidents scared Wells. In response he armed himself with a .357 Magnum, which he carried with him at all times.

emotional distress, and breach of fiduciary duty. Wells' claims for relief against Local 959 were tried before a jury. The superior court instructed the jury that to recover Wells had to prove that Local 959 had threatened his life and that the threat had proximately caused damage to him. The trial court further instructed that if Wells were entitled to recover compensatory damages, he was to be awarded the amount which would reasonably compensate him for:

1. severe emotional distress, fear, and mental anguish

2. past lost earnings

3. future lost earnings

4. the present value of Wells' retirement benefits lost

The jury was also instructed that if it found that the Local had threatened Wells' life it could, but was not required to, award punitive damages.

The jury found that Local 959 had threatened Wells' life entitling him to compensatory damages. It awarded $12,500 for emotional distress; $32,500 for past lost earnings; no damages for future lost earnings; and $73,000 for the present value of loss of retirement benefits. The jury also determined that Wells was entitled to $300,000 in punitive damages.[5] A final judgment was subsequently entered and this appeal followed.

5. When polled, all but one juror agreed that Local 959 had threatened Wells' life. The jury was unanimous on the special verdicts for emotional distress damages, past lost earnings, future lost earnings, and present value of lost retirement benefits. Two jurors disagreed on the award of punitive damages.

6. In making this ruling the superior court reasoned:

THE COURT: Very well. I disagree. It appears to me that the Counts I, II and IV plead causes of action—actually, they only plead one cause of action. They plead different legal theories for each cause of action, but they're all essentially exactly—not essentially; they're all based on exactly the same conduct and the same occurrences. I see no Federal preemption whatsoever because there's no allegation that the union was acting in allegedly threatening Arlo Wells' life with the intent to affect the exercise of any collective bargaining

## II. WERE WELLS' CLAIMS PREEMPTED BY FEDERAL LABOR LAW?

Local 959 contends that the superior court erred in refusing to dismiss Wells' claims for assault, intentional infliction of emotional distress, and breach of fiduciary duty. Local 959 moved to dismiss these claims on the ground that they were preempted by the National Labor Relations Act. Prior to trial the superior court denied the motion to dismiss.[6]

State courts are preempted of jurisdiction over activities that are protected, prohibited, or regulated under federal labor law. The seminal case establishing the scope of federal preemption in the area of labor relations is *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). There the Supreme Court stated:

When the exercise of state power over a particular area of activity threatened interference with the clearly indicated policy of industrial relations, it has been judicially necessary to preclude states from acting. However, due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy, has required us not to find withdrawal from the States of power to regulate where the activity regulated was a merely peripheral concern of the

rights on his part. There's absolutely no allegation to that effect. Mr. Kennelly has disavowed any intent to make any such showing at trial; he would not be permitted to do so because, indeed, that would place the case within the Federal preemption doctrine.

Here, it's just as though the union were a complete outsider vis-a-vis Mr. Wells. The union, through its agents, allegedly made threats on Arlo Wells' life for purposes which had no connection whatsoever to his right to exercise his Federal collective bargaining rights under the National Labor Relations Act. I think that's essential for Federal preemption; it's absent here. The motion is denied.

The only claim for relief on which the superior court instructed the jury was intentional infliction of emotional distress. Thus we agree with Wells' contention that the question of whether the claims for assault and breach of fiduciary duty were preempted has been mooted.

Labor Management Relations Act. Or where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act.

When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield.

*Id.* at 243–45, 79 S.Ct. at 778–79, 3 L.Ed.2d 782–83 (citations and footnotes omitted).[7]

### A. *Were Local 959's Activities Arguably Within the Scope of the NLRB's Jurisdiction?*

The first issue to be determined is whether the union's activity was arguably within the scope of the NLRB's jurisdiction.[8] Local 959 argues that there is an evidentiary basis for finding the union's actions within the unfair labor practice provisions of the NLRA. It first contends that "any violence or threat against [a union] member could arguably constitute coercion and restraint within the meaning of [section] 8(b)(1)(A)." Second, attempts to have

Wells' wife quit work at Odom may have constituted a violation of Section 8(b)(1)(B) which provides that it is an unfair labor practice to restrain or coerce an employer in the selection of its supervisors. Third, it argues that it was a restraint on the company's selection of Donna as its representative for the purposes of collective bargaining or the adjustment of grievances.

Wells argues that "Local 959 threatened his life because Donna would not either quit her employment with Odom Company, against whom the union was on strike, or disclose confidential information concerning Odom to the union" and because Donna Wells is not a party to the action no preemption can occur.

In our view the union's activities are arguably within the ambit of the NLRA. Acts or threats of violence against one employee may violate the rights of other employees to make free choices to exercise or to refrain from exercising their rights to collective bargaining, self organization, etc. *Cf. NLRB v. Union Nacional de Trabajadores,* 540 F.2d 1, 6 (1st Cir.1976) ("[Union] threats directed against a non-employee can constitute a § 8(b) violation if they occur in contexts in which employees are likely to learn of them."). Here there appeared to be considerable discussion and

---

**7.** The *Garmon* rule has been further clarified and refined over the years. In *Local 926, Int'l Union of Operating Eng'rs v. Jones,* 460 U.S. 669, 676, 103 S.Ct. 1453, 1458, 75 L.Ed.2d 368, 375–76 (1983), the Supreme Court described its approach to the preemption issue:

First, we determine whether the conduct that the State seeks to regulate or to make the basis of liability is actually or arguably prohibited by the NLRA. *Garmon, supra,* [359 U.S.] at 245, 3 L.Ed.2d 775, 79 S.Ct. 773 [at 779]; *see Sears, [Roebuck & Co. v. Carpenters,* 436 U.S. 180] at 187–90 [98 S.Ct. 1745 at 1752–1754], 56 L.Ed.2d 209.... Although the "*Garmon* guidelines [are not to be applied] in a literal, mechanical fashion," *Sears, supra,* at 188 [98 S.Ct. at 1752] ... if the conduct at issue is arguably prohibited or protected otherwise applicable state law and procedures are ordinarily pre-empted. *Farmer v. Carpenters,* 430 U.S. [290] at 296 [97 S.Ct. 1056 at 1061], 51 L.Ed.2d 338.... When, however, the conduct at issue is only a peripheral concern of the Act or touches on interests so deeply rooted in local feeling and responsibili-

ty that, in the absence of compelling congressional direction, it could not be inferred that Congress intended to deprive the State of the power to act, we refuse to invalidate state regulation or sanction of the conduct. *Garmon, supra* [359 U.S.], at 243–44 [79 S.Ct. at 778–79], 3 L.Ed.2d 775.... The question of whether regulation should be allowed because of the deeply rooted nature of the local interest involves a sensitive balancing of any harm to the regulatory scheme established by Congress, either in terms of negating the Board's exclusive jurisdiction or in terms of conflicting substantive rules, and the importance of the asserted cause of action to the state as a protection to its citizens. *See, Sears, supra* [436 U.S.], at 188 [98 S.Ct. at 1752], 56 L.Ed.2d 209 ... *Farmer, supra,* [430 U.S.] at 297 [97 S.Ct. at 1061], 51 L.Ed.2d 338....

**8.** See *Sears,* 436 U.S. at 185–190, 98 S.Ct. at 1751–54, 56 L.Ed.2d at 218–19; *Brown Jug, Inc. v. International Bhd. of Teamsters, Local 959,* 688 P.2d 932, 935–37 (Alaska 1984); *cf. United Constr. Workers v. Laburnum Constr. Corp.,* 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954).

some complaints about Wells' wife working as a supervisor and her "taking" a union job. Thus any threats or coercion against Arlo Wells which others may have learned about may have led to an unfair labor practice, because it could have intimidated other employees from making free choices.[9]

Moreover, the attempt of Local 959 to have Donna either quit or provide information arguably violates § 8(b)(1)(B), which forbids a union to coerce an employer in the choice of a bargaining representative. Donna was a supervisor with the power to fire employees. The NLRB has taken the position that a union violates § 8(b)(1)(B) by coercing a choice of supervisor even without proof that the supervisor in question actually has collective bargaining authority. (The NLRB recognized that an employer frequently draws a collective bargaining representative from the existing pool of supervisors.) *See Operating Eng'rs,* 460 U.S. at 679 n. 10, 103 S.Ct. at 1460 n. 10, 75 L.Ed.2d at 378 n. 10. Thus, we conclude that the union's activities are arguably unfair labor practices within the National Labor Relations Board's jurisdiction.

B. *Does the Activity Sought to Be Regulated by the State Tort Action Touch on Interests so Deeply Rooted in Local Feeling and Responsibility That Congress Would not Have Intended to Invalidate the State Sanction?*

Both parties rely on *Farmer v. United Bhd. of Carpenters and Joiners of America, Local 25,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), in arguing this issue. In *Farmer,* the Supreme Court addressed the question whether an action in state court against a union for intentional infliction of emotional distress was preempted by federal labor law. *Id.* at 293–95, 97 S.Ct. at 1059–60, 51 L.Ed.2d at 345–46. The lower court had sustained a demurrer to allegations of discrimination in union

hall referrals and breach of contract on the ground that they were preempted by federal law, but allowed the case to go to trial on the intentional infliction of emotional distress claim. *Id.* The Supreme Court found that the intentional infliction of emotional distress claim was not preempted. *Id.* at 305, 97 S.Ct. at 1066, 51 L.Ed.2d at 353.

In examining the state interest which permitted exceptions to the general rule of preemption the Supreme Court stated:

> Nothing in the federal labor statutes protects or immunizes from state action violence or the threat of violence in a labor dispute, *Automobile Workers v. Russell,* 356 U.S. at 640, 2 L.Ed.2d 1030; *id.* at 649, 2 L.Ed.2d 1030 (Warren, C.J., dissenting); *United Constr. Workers v. Laburnum Constr. Corp.,* 347 U.S. 656, 666 [74 S.Ct. 833, 838], 98 L.Ed. 1025 (1954), and thus there is no risk that state damage actions will fetter the exercise of rights protected by the NLRA.... [S]tate court actions to redress injuries caused by violence or threats of violence are consistent with effective administration of the federal scheme; such actions can be adjudicated without regard to the merits of the underlying labor controversy.

*Id.* at 299–300, 97 S.Ct. at 1063, 51 L.Ed.2d at 349–50.

Petitioner's complaint in *Farmer* alleged that defendants had intentionally engaged in "outrageous conduct, threats and intimidations, and words" which caused "him to suffer grievous mental and emotional distress as well as great physical damage." *Id.* at 301, 97 S.Ct. at 1064, 51 L.Ed.2d at 351. The Supreme Court responded that "[w]ith respect to [his] claims of intentional infliction of emotional distress, we cannot conclude that Congress intended exclusive jurisdiction to lie in the Board." *Id.* at 302, 97 S.Ct. at 1064, 51 L.Ed.2d at 351. It continued:

---

**9.** *Cf. also, Operating Eng'rs,* 460 U.S. at 677, 103 S.Ct. at 1459, 75 L.Ed.2d at 376 ("the Union arguably violated § 8(b)(1)(A), since causing the discharge of a supervisor might coerce employees, who would fear meeting their supervisor's fate, into forgoing their § 7 rights to engage in concerted action.") (discussing *Iron Workers v. Perko,* 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963)).

Regardless of whether the operation of the hiring hall was lawful or unlawful under federal statutes, there is no federal protection for conduct on the part of union officers which is so outrageous that "no reasonable man in a civilized society should be expected to endure it." Thus ... permitting the exercise of state jurisdiction over such complaints does not result in state regulation of federally protected conduct.

The State, on the other hand, has a substantial interest in protecting its citizens from the kind of abuse of which Hill complained. That interest is no less worthy of recognition because it concerns protection from emotional distress caused by outrageous conduct, rather than protection from physical injury, as in *Russell*, or damage to reputation, as in *Linn* [*v. Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966)].

*Id.*[10] The Supreme Court noted two further limitations on state tort actions for intentional infliction of emotional distress. First, the emotional distress must be based on "outrageous" conduct, rather than "on the type of robust language and clash of strong personalities that may be common place in various labor contexts." *Id.* at 305–06, 97 S.Ct. at 1066, 51 L.Ed.2d at 353. Second, "state trial courts have the responsibility ... to assure that the damages awarded are not excessive." *Id.* at 306, 97 S.Ct. at 1066, 51 L.Ed.2d at 353–54.

Here the action in the superior court was based not on the union's coercion of Wells through its actions, but on the outrageous manner in which it was done. It was a suit based on threats of violence. The threat to Wells' life and the constant intrusions into his family affairs constituted outrageous conduct.[11] Regulation of such threats touches and concerns the state's interest in protecting its citizens.[12] Therefore we hold that Wells' superior court action for intentional infliction of emotional distress was

**10.** The Supreme Court was careful to limit its holding. It distinguished between claims based on union activity that was itself regulated by federal law, and claims based on the manner in which the union conducted its activities.

Union discrimination in employment opportunities cannot itself form the underlying "outrageous" conduct on which the state court tort action is based; to hold otherwise would undermine the pre-emption principle. Nor can threats of such discrimination suffice to sustain state court jurisdiction. It may well be that the threat, or actuality, of employment discrimination will cause a union member considerable emotional distress and anxiety. But something more is required before concurrent state court jurisdiction can be permitted. Simply stated, it is essential that the state tort be either unrelated to employment discrimination or a function of the particularly abusive manner in which the discrimination is accomplished or threatened rather than a function of the actual or threatened discrimination itself.

*Id.* at 305, 97 S.Ct. at 1066, 51 L.Ed.2d at 353.

**11.** An illustration in the Restatement supports this view:

A, the president of an association of rubbish collectors, summons B to a meeting of the association, and in the presence of an intimidating group of associates tells B that B has been collecting rubbish in territory which the association regards as exclusively allocated to one of its members. A demands that B pay over the proceeds of his rubbish collection, and tells B that if he does not do so the association will beat him up, destroy his truck, and put him out of business. B is badly frightened, and suffers severe emotional distress. A is subject to liability to B for his emotional distress, and if it results in illness, A is also subject to liability to B for his illness.

Restatement (Second) of Torts § 46 illustration 2 (1965); *see Atchison, Topeka and Santa Fe Ry. v. Buell,* 480 U.S. ——, —— n. 13, 107 S.Ct. 1410, 1416 n. 13, 94 L.Ed.2d 563, 574 n. 13 (1987) (citing Restatement § 46 and *Farmer* for necessity of "outrageous" conduct); *Rulon–Miller v. International Business Mach.,* 162 Cal.App.3d 241, 208 Cal.Rptr. 524 (1984) (outrageous conduct found where employer told employee that he decided that she could not see her boyfriend who worked in a rival company).

**12.** We have previously recognized that where a tort claim arises out of activities that are arguably protected or prohibited under federal labor law, a state court retains concurrent jurisdiction "where the activity regulated was a merely peripheral concern of [federal labor law] and where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, [the court] could not infer that Congress has deprived the states of the power to act." *Brown Jug, Inc. v. International Bhd. of Teamsters,* 688 P.2d 932, 935 (Alaska 1984) (quoting *Garmon,* 359 U.S. at 243–44, 79 S.Ct. at 778–79, 3 L.Ed.2d at 782). In *Brown Jug* we held that Alaska courts have jurisdiction over tort actions for trespassory picketing.

not preempted by the National Labor Relations Act.

## III. DID THE SUPERIOR COURT ERR IN ITS INSTRUCTIONS PERTAINING TO WELLS' CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS?

 Local 959 argues that the trial court erred by ruling that, as a matter of law, a threat to one's life is outrageous conduct, thus removing from the jury's consideration the question whether its conduct was "outrageous." Given this determination the jury was instructed that it need only find two elements proven by Wells to award damages for the intentional infliction of emotional distress. Those elements were: (1) "That defendant Teamsters Local 959 threatened plaintiff's life and (2) that the threat was a proximate cause of damage to the plaintiff." Local 959 agrees that a court must determine whether the severity of the emotional distress and the conduct of the offending party warrant an instruction on intentional infliction of emotional distress. But it argues that here the court in effect gave Wells a directed verdict on a key element of his claim for intentional infliction of emotional distress. Local 959 argues that the instruction constitutes plain error. It additionally argues that the instruction on the elements of the tort of intentional infliction of emotional distress erroneously ignored another element—that Local 959 acted in deliberate disregard of a high degree of probability that emotional distress would follow (i.e., foreseeability).

Wells responds that any failure to include specific reference to outrageous conduct in the jury instructions was effectively cured by another of the trial court's instructions which defined "severe emotional distress" at the damage stage as "emotional distress of such substantial quantity or enduring quality that no reasonable person in a civilized society should be expected to endure it." Wells contends that foreseeability is not a matter of the tortfeasor's subjective intent, but rather involves an objective determination. He also argues that it is inconceivable that the jury could award $300,000 in punitive damages against Local 959 and not find its threat extreme and outrageous.

In *Richardson v. Fairbanks North Star Borough,* 705 P.2d 454, 456 (Alaska 1985), we adopted the Restatement (Second) of Torts § 46(1) (1965), which provides:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Thus, the elements of a cause of action for intentional infliction of emotional distress are: (1) the conduct is extreme and outrageous, (2) the conduct is intentional or reckless, (3) the conduct causes emotional distress, and (4) the distress is severe.[13]

As we previously noted, the superior court refused to submit to the jury the question whether the conduct of Local 959 was "outrageous" as well as whether Local 959 acted in deliberate disregard of a high degree of probability that emotional distress would follow. If reasonable jurors

---

**13.** *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 703 F.2d 1152, 1158 (10th Cir.1981), *order on rehearing en banc* (1983); *see Newby v. Alto Riviera Apartments,* 60 Cal.App.3d 288, 296, 131 Cal.Rptr. 547, 552 (1976).

The Restatement (Second) of Torts § 46 defines each of those elements. Extreme and outrageous conduct is conduct which goes beyond all possible bounds of decency so as to be regarded as atrocious and utterly intolerable in a civilized community. *See* Restatement (Second) of Torts § 46 comment d. "The liability ... does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are

still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." *Id.* Rather, "the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* An actor intends to inflict emotional distress if he desired to inflict severe emotional distress, or where he knew that such distress was certain or substantially certain to result from his conduct. *Id.* § 46 comment i.

could differ as to whether the evidence adduced at trial demonstrated either outrageous conduct or foreseeability then the superior court was required to submit either or both of these questions to the jury for resolution.

In response to Local 959's objections to the court's instructions on the emotional distress claim the superior court stated in part:

> [I]f we don't have a cause of action on behalf of someone whose life is directly threatened by someone else, then I think we're back into the middle ages.
>
> . . . .
>
> I find as a matter of law that making a threat to take someone's life is, as a matter of law, outrageous conduct which is sufficient basis on which to find and award for severe emotional distress, and that I therefore need not instruct the jury ... on the question of outrageous conduct.

We agree with the superior court's analysis and affirm its conclusion that there was no issue as to outrageous conduct to submit to the jury.[14] We further hold that the superior court did not err in not requiring the jury to find that the conduct of Local 959 carried with it a high probability that it would result in severe emotional distress. Whether emotional distress is reasonably foreseeable is determined by the objective standard of what a reasonably prudent person should foresee. Wells contends that "it is clear that any reasonable person in a civilized society should foresee the reasonable probability that severe emotional dis-

tress would occur from a threat on another's life."[15] We agree with Wells' position and thus hold that the superior court did not err in deciding the foreseeability of severe emotional distress issue as a matter of law.[16]

## IV. DID THE SUPERIOR COURT ERR IN ADMITTING THE TESTIMONY OF LEW HAHN?

Local 959 argues that the trial court erred in admitting Lew Hahn's testimony concerning episodes of violence aimed at him while he was working for Odom during the strike. It argues that his testimony was not relevant because none of the violent acts against Hahn were aimed at Wells, and that even if the evidence was relevant, its prejudicial nature outweighed its probative value.

Wells contends that while Hahn's testimony may not have been relevant to the issue of whether or not Local 959 engaged in extreme and outrageous conduct toward Wells, it "was relevant to the issue of whether Wells suffered severe emotional distress as a result of the threat to his life, the intensity and duration of the emotional distress, and whether he acted reasonably in terminating his union membership because of the threat." That is, the testimony was offered not to prove the facts asserted, but to prove Wells' resultant state of mind based on the incidents related to him by Hahn. He argues that Hahn's testimony validated Wells' knowledge of incidents of violence, and that the description of these incidents was such "that he be-

14. Even if we were persuaded that the superior court erred in taking this issue from the jury we would conclude that any such error was harmless. Here the jury found that Local 959 threatened Wells' life and that this threat proximately caused "severe emotional distress," which was defined as "emotional distress of such substantial quality or enduring quantity that no reasonable person in a civilized society should be expected to endure it." Given the foregoing, a reasonable jury would not have differed with the superior court's conclusion that the conduct of Local 959 was outrageous.

15. In support of this argument Wells cites Restatement (Second) of Torts § 46 illustration 1 (1965):

As a practical joke, A falsely tells B that her husband has been badly injured in an accident, and is in the hospital with both legs broken. B suffers severe emotional distress. A is subject to liability to B for her emotional distress. . . .

16. Again even if we were to conclude that the superior court erred, and that the foreseeability question should have been submitted to the jury, we are of the view that this error was harmless. It is highly unlikely that a reasonable juror would not conclude that the union should have known that threatening Wells' life would cause emotional distress. Thus, it appears unlikely that the jury's verdict would have differed on this issue.

lieved that the threat to his life by Local 959 was, under the atmosphere of violence that he knew to exist, a threat that was serious and probable of imminent execution." Even if it was error to admit Hahn's testimony, he argues, the error was harmless because the testimony was minor, was not mentioned by Wells' counsel in closing argument, and the substance of the testimony was before the jury through other witnesses to whose testimony there was no objection.[17]

In our view Hahn's testimony was relevant to Wells' state of mind and was probative of the likelihood that the Teamsters' alleged threat would cause Wells to experience severe emotional distress.[18] We must next determine whether this evidence should have been excluded because its probative value was outweighed by the danger of "unfair prejudice."[19] Alaska R.Evid. 403.

We hold that the superior court did not abuse its discretion in admitting this evidence. Hahn's testimony was for the most part cumulative: Wells himself testified that he had knowledge of some of the incidents mentioned, including "windows being shot out," "bullet holes in doors and vehicles," and "tires being slashed." Likewise, Wells' wife testified that she told him of daily incidents of shootings, bullet holes in warehouse doors, and mass picketing. Moreover, attached to its trial brief, Local 959 included a copy of Wells' affidavit to the NLRB, which referred to statements made by Lew Hahn and others regarding the violence that occurred during the Odom strike. At trial Local 959 moved that this affidavit be admitted in evidence.

While Hahn's testimony was more detailed than Wells', it was corroborative of Wells' state of mind, and it gave the jury particular details with which Wells was familiar—all of which assisted the jury in determining whether Wells' contention of emotional distress was plausible. Thus, we hold that the probative value of Hahn's testimony outweighed its prejudicial ef-

---

**17.** We considered this issue at length in *Poulin v. Zartman*, 542 P.2d 251, 260 (Alaska 1975).

A trial court will only be reversed for admitting prejudicial, but otherwise relevant, evidence if has committed a "clear abuse of discretion." *Davis v. Chism*, 513 P.2d 475, 479 (Alaska 1973). Thus, we first must consider the relevance of the testimony and then determine whether its prejudicial effect so outweighed its probative value that admission by the trial judge constituted a "clear abuse of discretion." *See, e.g., Love v. State*, 457 P.2d 622 (Alaska 1969).

Alaska case law defines the test of relevancy. "To be of sufficient relevance for admission, testimony, documents or other evidence must have some tendency in reason to establish a proposition material to the case." *Hutchings v. State*, 518 P.2d 767, 769 (Alaska 1974). The dual concepts of logical relevance, some tendency to establish the ultimate point for which the evidence is offered, and materiality, germaneness of the ultimate point to issues in the trial, have been emphasized repeatedly in our opinions. (Footnotes omitted.)

In determining whether an erroneous admission of evidence requires reversal, the appellant has the burden of proving error and prejudice. *Poulin v. Zartman*, 542 P.2d 251, 261 (Alaska 1975); *on rehearing*, 548 P.2d 1299 (1976); *Zerbinos v. Lewis*, 394 P.2d 886, 889–90 (Alaska 1964); Alaska R.Civ.P. 61. As we stated in *Love v. State*, 457 P.2d 622, 631 n. 5 (Alaska 1969): " '[T]he members of this court

must necessarily put themselves, as nearly as possible, in the position of the jury in order to determine whether, as reasonable men, the error committed probably affected their verdict.' " (quoting *State v. Dutton* [83 Ariz. 193], 318 P.2d 667, 671 (Ariz.1957)). Among the factors to be considered in determining whether error was harmless is the degree of emphasis placed upon the evidence during the trial, both during questioning and in the closing arguments. *Poulin v. Zartman*, 542 P.2d at 261.

*Alyeska Pipeline Serv. Co. v. O'Kelley*, 645 P.2d 767, 773 (Alaska 1982) (footnote omitted). Generally, where otherwise inadmissible evidence is merely cumulative, admission of such evidence is harmless. *See Fairbanks North Star Borough v. Tundra Tours, Inc.*, 719 P.2d 1020, 1034–35 (Alaska 1986); *Otis Elevator Co. v. McLaney*, 406 P.2d 7, 11–12 (Alaska 1965).

**18.** *Cf. Stewart–Smith Haidinger, Inc. v. Avi–Truck, Inc.*, 682 P.2d 1108, 1119 (Alaska 1984) (finding employees' hearsay testimony of conversations with FAA officials relevant for demonstrating their state of mind and the reasonableness of their reliance on the FAA statements).

**19.** "Unfair prejudice" within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. Alaska R.Evid. 403, commentary.

**360** ■ 

fect.[20]

## V. DID THE SUPERIOR COURT ERR IN DENYING LOCAL 959'S MOTION FOR A NEW TRIAL OR REMITTITUR?

Local 959 argues that the superior court erred in denying its motion for a new trial or remittitur. The Local based its motion on the lack of evidence that Wells was physically injured and the scant evidence of his emotional distress.[21]

■ Our study of the record persuades us that there was substantial evidence presented at trial that Wells feared for his life. His affidavit and testimony both disclose that fear. Wells testified he was frightened, his wife testified he sounded shook up, and his affidavit stated:

> The only reason I'm here in Seattle, is because I am in fear of my life based on my prior experiences with the teamsters

and the violent acts that have occurred during the Odom strike.[22]

The jury could have found that an implied threat on Wells' life was sufficiently severe to result in emotional damage. We conclude that there is a sufficient evidentiary basis for the jury's award of $12,500 for emotional distress. This award cannot be said to be either unreasonable or the result of undue passion or prejudice.

The focus of Local 959's challenge to the superior court's decision to deny it a new trial or remittitur is that the jury was swayed by prejudice and passion in reaching its special verdicts. The Local complains of Wells' counsel's remarks to the jury, and of the superior court's failure to give a cautionary instruction.[23] It also complains of the punitive damages instructions. It argues that the jury's prejudice is reflected in the jury's note to the judge, seeking to punish the union for all its deeds

---

**20.** The commentary to the evidence rules provides:

> If the balance between probative value and prejudicial effect ... is close, the Judge should probably decide to admit the evidence. In other words, there is a slight presumption in favor of admitting relevant evidence. In order to overcome this minimal presumption, the prejudicial effect must be *demonstrably greater* than the probative value of the evidence.

Alaska Rule of Evidence 403, commentary (emphasis added).

**21.** The decision to order a remittitur or a new trial rests in the sound discretion of the trial court. *Sturm, Ruger & Co. v. Day*, 594 P.2d 38, 48 (Alaska 1979). This court

> will not interfere with the trial court's decision unless we are "left with a firm conviction on the whole record that the trial judge made a mistake in refusing to order a remittitur or grant a new trial," *City of Nome v. Ailak*, 570 P.2d 162, 173 [(Alaska 1977)], and where intervention on our part is necessary to prevent a miscarriage of justice.

*Id.*

> A court should order a new trial when the jury verdict indicates that [the] jury acted with passion and prejudice. *See International Brotherhood of Teamsters, Local 959 v. King*, 572 P.2d 1168, 1178–79 (Alaska 1977); *Hash v. Hogan*, 453 P.2d 468, 473 (Alaska 1969). Generally, mere excessiveness does not warrant the conclusion that the verdict was the result of emotion, prejudice, or improper motive on the part of the jurors. *Sturm, Ruger & Co. v. Day*, [615] P.2d 621, 624 n. 2 (Alaska 1980), *on*

*rehearing* 627 P.2d 204 ([Alaska] 1981). An excessive verdict can be corrected by remittitur.

*Exxon Corp. v. Alvey*, 690 P.2d 733, 741 (Alaska 1984).

**22.** The Restatement (Second) of Torts § 46 comment k requires no bodily harm:

> Normally, severe emotional distress is accompanied or followed by shock, illness, or other bodily harm, which in itself affords evidence that the distress is genuine and severe. The rule stated is not, however, limited to cases where there has been bodily harm; and if the conduct is sufficiently extreme and outrageous there may be liability for the emotional distress alone, without such harm.

**23.** The following exchange took place during closing arguments:

> MR. KENNELLY: ... Think of it: we're not talking about—we're not talking about the carpenters or some other trade union; we're talking about the Teamsters Union. The Teamsters Union that's had how many other international leaders in the last 20 years have gone to the penitentiary or been indicted for major felonies.
>
> MR. PORTER: Objection, Your Honor. That it—that is improper final argument.
>
> THE COURT: It's not in evidence; the objection is sustained. The jury should disregard that.

Counsel for the Local made no further objections to the statement, to the court's instruction to the jury, or to the court's admonishment of Wells' counsel.

rather than for merely the actions against Wells.[24]

At the outset it should be noted that the Local did not object to the court's instruction on punitive damages, and therefore cannot raise this issue on appeal unless there is plain error. The same can be said of the alleged failure of the trial court to give the jury a cautionary instruction regarding counsel's allegedly improper argument.

■ Local 959's argument with regard to the trial court's jury instruction on punitive damages parallels its argument concerning the court's instructions on the elements of the emotional distress claim. Local 959 claims that the trial court erred in not explicitly instructing the jurors that they must find outrageous conduct or reckless indifference before assessing any punitive damages. For the same reasons that we concluded that the superior court's instruction pertaining to Wells' claim for intentional infliction of emotional distress did not constitute error, we conclude that its instruction regarding punitive damages also did not constitute plain error.[25]

■ Local 959 points to the jury's award of past earnings to Wells as indicative of the jury's prejudice. The jury awarded Wells $32,500 for past lost earnings and nothing for future lost earnings. The Local points to testimony which it claims indicates that Wells' past lost earnings were based on his employer's decision to require its drivers to be independent truck drivers,

rather than because of his withdrawal from the union.

If, however, Wells had remained a union driver, he would not have been required to acquiesce to the employer's demand that he become an independent truck driver, and therefore he could have continued to receive hourly union wages, even if he had to work for another employer. Moreover, there was testimony that because of his termination from the union, Wells lost some $130,000 in earnings. Although he had been working during the period in question, he had essentially no reported income because of expenses. Therefore we conclude that it was not unreasonable for the jury which balanced this testimony with that of the union's expert (who testified that Wells had no lost past earnings), to award him $32,500. Moreover, the jury awarded Wells no damages for future lost earnings; Wells' expert testified that his future lost earnings would be $236,000 and the union's expert testified this figure should be zero. In our view, the jury's separate treatment of past and future lost earnings does not reveal passion or prejudice.[26]

■ Even Wells' counsel's inflammatory remarks, while improper, cannot be said to have resulted in an overall award that was the product of passion or prejudice. The superior court ordered the jury to disregard counsel's remark. While the jury's note asked the superior court whether the punitive damages assessed had to be

---

**24.** The jury submitted the following note to the court in the course of deliberations:

> Our deliberations have run into an impass [sic] at Item 4 of the *Special Verdicts* concerning punitive damages.
> While there is strong feeling that punitive damages should be awarded, the question is does the full amount of this go to the plaintiff?
> The instructions indicate that the jury is left to decide an amount to fairly punish the Defendant. In that light it is felt that the Defendants [sic] acts, financial and social condition and standing, requires a stiff punishment with most of the proceeds directed to a cause other than the plaintiff's.

The court instructed the jury that any punitive damages would be awarded to the plaintiff and warned them not to disclose the state of their

deliberations again. Counsel for both parties agreed to these instructions both before and after they were given.

**25.** *See Ben Lomond, Inc. v. Campbell*, 691 P.2d 1042, 1047–48 (Alaska 1984) (while this court has used the term "outrageous" in relation to punitive damages, the use of that term is not required).

**26.** The total jury award for compensatory damages was $118,000, and the punitive damages award was $300,000. Thus, the punitive damages to compensatory damages ratio was less than 3 to 1. Although this ratio is not dispositive of whether the award was per se excessive, it was in accord with other damage ratios upheld by this court. *See id.* at 1048.

awarded to Wells, the trial court indicated to the jury that Wells would be the recipient of any punitive damages awarded. The superior court asked counsel if there would be any objections to its statement to the jury to that effect. Local 959's counsel did not object to the manner of the superior court's response.[27] Thus, the jury was required to focus its punitive damages award considerations as initially instructed, on the union's behavior towards Wells.

The only potentially serious argument raised by the union's remittitur/new trial specification of error is whether the superior court was remiss in not considering the wealth of the union. The union itself did not raise the issue in its motion. It argues that Wells should have presented evidence of the union's wealth. It further argues that because of judgment in this suit the union had to file a petition in bankruptcy. Our problem with this argument is that by not raising the issue in the superior court, the Local gave the court no opportunity to consider the issue. In such circumstances we hold that the superior court cannot be said to have abused its discretion in denying the motion for remittitur or new trial.[28]

The judgment of the superior court is AFFIRMED.[29]

---

27. Thus, the union must demonstrate that plain error occurred. *Murray v. Feight,* 741 P.2d 1148, 1156–57 (Alaska 1987).

28. In its instruction on punitive damages the superior court informed the jury in part: "In addressing such damages you may consider the nature and the extent of the Defendant's acts, the circumstances in which the acts occurred, and the financial and social condition and standing of the Defendant."

29. Our disposition of this appeal makes it unnecessary to address any issue pertaining to the superior court's award of attorney's fees to Wells.