**WAL–MART, INC., a foreign corporation, Mark Divis, manager, and Randy Hardy, employee, Appellants,**

v.

**Elvis R. STEWART, Appellee.**

No. S–8259.

Supreme Court of Alaska.

Nov. 12, 1999.

Ann S. Brown and Paulette Bea Hagen, Lane Powell Spears Lubersky LLP, Fairbanks, for Appellants.

David E. George, Rex Lamont Butler & Associates, and Ken A. Norsworthy, Edgar Paul Boyko and Associates, Anchorage, for Appellee.

Before MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

COMPTON, Justice.

### I. *INTRODUCTION*

Elvis R. Stewart sued Wal–Mart for violating Alaska's civil rights statute, for invading his common-law right to privacy, and for negligent and intentional infliction of emo-

tional distress. He sought both compensatory and punitive damages. At the close of Stewart's case, Wal–Mart moved for a directed verdict. The court denied the motion. The jury returned a verdict in favor of Wal–Mart on Stewart's civil rights claim, but found for Stewart on his claims of invasion of privacy and intentional infliction of emotional distress. The jury awarded Stewart both compensatory and punitive damages. Wal–Mart moved for, and was denied, a judgment notwithstanding the verdict (JNOV) on the issue of punitive damages. Wal–Mart appeals the court's denial of its motions for a directed verdict and a JNOV. Wal–Mart also appeals numerous evidentiary rulings and the court's failure to remove an allegedly conflicted juror. We affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

In July 1994 Elvis R. Stewart, an African-American, began working for the McDonald's restaurant located inside the Wal–Mart store on Benson Boulevard in Anchorage. Stewart was hired to work the grill area; eventually he was moved to the area of the restaurant where people eat. Stewart's shift was from 7:30 p.m. until closing, the time of which varied. Stewart also worked at Taco Bell. Stewart's shift at Taco Bell was from 11:30 a.m. until 7:00 p.m. In order to work both shifts, Stewart carried a change of clothes and personal items in a duffel-type bag. He would change out of his Taco Bell uniform, and into his McDonald's uniform, in the Wal–Mart bathroom. He also took the time between shifts to freshen up, i.e., wash himself with soap and a washcloth that he carried in his bag, and brush his teeth. He used the Wal–Mart bathroom, instead of the Taco Bell bathroom, because it was larger and less crowded with customers.

Wal–Mart had a nation-wide policy of stationing a member of its management team at its exits to check for receipts of purchases made by Wal–Mart and McDonald's employees, and to check for stolen items that might be concealed in their personal bags. Management conducted the checks before employees left the store at the end of their shifts. Randy Hardy, a Wal–Mart assistant

manager, testified that management did not check women's purses, because women sometimes carry in their purses personal items that may be embarrassing to them.

The first few weeks Stewart worked at McDonald's, he exited the Wal–Mart store at the close of his shift without incident. According to Stewart, sometime during his third week of employment, Hardy stopped Stewart as he was exiting McDonald's at the end of his shift. Hardy asked to search Stewart's bag, and then proceeded to dump the contents of Stewart's bag onto the counter and look through it. According to Stewart, this type of bag search continued until mid-February 1995. Stewart testified that he routinely objected to the searches. On February 15 Stewart was again searched by Hardy. Hardy questioned Stewart about some candy bars in his bag, for which Stewart produced a receipt. After Hardy completed the bag search he allowed Stewart to leave. The next day Stewart came to McDonald's to speak with Sheila Hay, the wife of the franchise owner of the McDonald's where Stewart worked. It was Stewart's day off. He told Hay that he felt that Hardy was singling him out for bag searches. Hay took Stewart to speak with Mark Divis, the Wal–Mart store manager. Stewart repeated to Divis that he felt that Hardy was singling him out for bag searches. Divis called Hardy into the office. Hardy denied singling out Stewart for searches. Stewart testified that during the meeting Hay asked Hardy who else he searched. Stewart asked Hardy whether he searched certain people because they were black; Hardy answered yes. Divis promptly ended the meeting and conferred with Hay outside the presence of Hardy and Stewart.

On February 23 Stewart wrote a letter to Divis commending him on his "efforts with enforcing Wal–Mart [p]olicy, as it is in regards to the checking of *All bags* . . . ." But after he had written the letter, Stewart testified that things "drifted back to the same old way that—people started being singled out."

### B. Proceedings

In August 1995 Stewart sued Wal–Mart, Divis, and Hardy (hereinafter Wal–Mart, un-

less specifically referring to Hardy's searches), alleging that: (1) the bag searches, conducted solely on the basis of his race, violated rights protected by AS 18.80.220(a);[1] (2) the searches of his bag and person negligently[2] and intentionally inflicted emotional distress upon him; and (3) the searches violated his common-law right to privacy guaranteed by article I, section 23 of the Alaska Constitution. Stewart sought compensatory and punitive damages.

Prior to trial, Wal–Mart filed a Motion in Limine seeking to exclude "inadmissible evidence of supposed 'prior discriminatory acts' committed by the defendants." Wal–Mart argued that "[e]vidence that Randy Hardy and Mark Divis committed prior discriminatory acts does not make it more probable that they searched Stewart's bags on account of race." Furthermore, Wal–Mart argued that evidence of prior discriminatory acts would be inadmissible under Alaska Evidence Rule 404 because it was character evidence. Stewart opposed Wal–Mart's Motion in Limine; he also filed a motion to compel Wal–Mart to produce Hardy's personnel file. The trial court granted Wal–Mart's Motion in Limine in part. The court set out three guidelines that Stewart would be required to meet before the court would admit evidence that pertained to a prior discriminatory act. Those guidelines were: (1) "The evidence must pertain to the issues of race"; (2) "The evidence must pertain to specific instances of conduct by Randy Hardy, Mark Divis or other supervisory employees of Wal–Mart within the scope of their employment, and directed at employees and customers of Wal–Mart"; and (3) "The evidence must pertain to the mid-town Wal–Mart store in question." In regard to Hardy's personnel file, the court held that it did not find anything discoverable in it. The court did, however, allow Stewart to impeach Hardy with information from the personnel file that contradicted Hardy's deposition testimony.

At the close of Stewart's case-in-chief, Wal–Mart moved for a directed verdict on all counts. The court promptly denied the motion, except insofar as it pertained to the issue of punitive damages, which it took under advisement. The next day, the court stated: "I took the issue of directed verdict on punitive damages under advisement.... Having considered it, I'm going to allow the instruction to go to the jury. I'm going to deny the directed verdict." The court commented that Stewart "clears the hurdle of clear and convincing, but not by much."

The jury returned a verdict in favor of Wal–Mart on Stewart's civil rights claim. However, it did conclude that Stewart had proved by a preponderance of the evidence that Wal–Mart intentionally inflicted emotional distress on him, and that it had invaded his privacy. Lastly, the jury concluded that Stewart had proved by clear and convincing evidence that Wal–Mart's conduct warranted punitive damages because it had been "the result of malicious or hostile feelings toward plaintiff Stewart, or was undertaken with reckless indifference to his interests or rights, and was outrageous." The jury awarded Stewart $7,800 in compensatory damages and $50,000 in punitive damages. After the special verdict form was read in open court, the jury was polled and discharged. After the jury had been discharged, Wal–Mart moved for a JNOV with regard to punitive damages. The court denied Wal–Mart's motion.

Wal–Mart appeals the trial court's denial of its motions for a directed verdict and a JNOV, numerous evidentiary rulings, and the court's failure to excuse an allegedly conflicted juror.

## III. DISCUSSION

### A. Standard of Review

When reviewing denial of a motion for a directed verdict or a JNOV, we will not

---

1. Alaska Statute 18.80.220(a) provides in part:
 (a) Except as provided in (c) of this section, it is unlawful for
 (1) an employer to refuse employment to a person, or to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or

privilege of employment because of the person's race....

2. The superior court granted Wal–Mart's motion for summary judgment on Stewart's claim of negligent infliction of emotional distress.

"weigh conflicting evidence or judge the credibility of the witnesses."[3] Rather, we will "determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable [persons] could not differ in their judgment."[4] Our test is objective. If there is any room for diversity of opinion, the question is one for the jury. "We thus must examine the evidence presented at trial to determine if the jury's finding ... is supported by the evidence when viewed in the light most favorable to [Stewart]."[5]

■ We review "the trial court's decision[s] on admissibility of evidence under the abuse of discretion standard."[6]

B. *The Trial Court's Decision that Wal–Mart Was Not Entitled to a Directed Verdict on Any Count Was Correct.*

At the close of Stewart's case-in-chief, Wal–Mart moved for a directed verdict on all counts. Each was denied.

1. *Invasion of privacy*

We have recognized that all persons are entitled to the common-law "right to be free from harassment and constant intrusion into one's daily affairs."[7] This common-law right is delineated in the Restatement, whose approach we adopted in our *Luedtke* opinion.[8] Section 652B states:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

In *Luedtke* we stated that "courts have construed 'offensive intrusion' to require either an unreasonable manner of intrusion, or intrusion for an unwarranted purpose."[9]

Consistent with *Luedtke*, the trial court instructed the jury that

> [i]n order to recover, plaintiff must prove by a preponderance of the evidence that:
>
> (1) One or more defendants intentionally intruded upon the solitude, seclusion or private affairs or concerns of plaintiff Stewart; and
>
> (2) A reasonable person would find this a highly offensive intrusion.

The trial court defined "offensive intrusion" as this court did in *Luedtke*. The court further instructed the jury that any search to which Stewart had voluntarily consented could not be considered an offensive intrusion.

■ Wal–Mart argues that "Stewart cannot sustain a claim that mere searches of his bags were an actionable intrusion absent an independent illegal motive[,] especially as his attorney acknowledged that Wal–Mart had a legal right to undertake the searches." Wal–Mart cites no support for this assertion. In fact, in light of *Luedtke* and Section 652B, Wal–Mart's argument is simply incorrect as a matter of law. As *Luedtke* made clear, the jury could conclude that the bag searches had been done *either* for an unlawful reason *or* in an unreasonable manner.[10] Wal–Mart's argument that Stewart must prove an independent illegal motive on Wal–Mart's part in order to prove that it invaded his privacy is not well taken.

■ Wal–Mart also argues that it was improperly denied a directed verdict on the invasion of privacy claim because the jury's special verdict form showed that it did not find that Wal–Mart had violated Stewart's civil rights. This argument lacks merit. At

---

3. *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 220 (Alaska 1978) (quoting *Holiday Inns of Am., Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974)).

4. *Id.* (quoting *Peck*, 520 P.2d at 92).

5. *Id.*

6. *Williams v. Utility Equip., Inc.*, 837 P.2d 1112, 1115 (Alaska 1992) (citation omitted).

7. *Luedtke v. Nabors Alaska Drilling, Inc.*, 768 P.2d 1123, 1137 (Alaska 1989) (quoting *Siggelkow v. State*, 731 P.2d 57, 62 (Alaska 1987)).

8. *See id.* (quoting Restatement (Second) of Torts § 652B (1977)).

9. *Luedtke*, 768 P.2d at 1137 (citation omitted).

10. *See Luedtke*, 768 P.2d at 1137.

the time that Wal–Mart moved for a directed verdict, the only question before the court was whether a reasonable juror could conclude that Wal–Mart had invaded Stewart's privacy, either because they searched him in an unreasonable manner or because they searched him for an unlawful reason, i.e., because he was an African–American. The jury's ultimate rejection of Stewart's civil rights claim is irrelevant to whether the superior court should have directed a verdict on Stewart's invasion of privacy claim.

Our review of the record discloses sufficient evidence that would allow reasonable minds to conclude that Wal–Mart searched Stewart's bag in an unreasonable manner or for an unlawful reason.

### a. *Unreasonable manner*

■ Stewart presented witnesses who testified to the manner in which Hardy searched Stewart's bag. The following are examples of this evidence:

(1) Stewart testified that Hardy told him to "empty out [his] pockets, all—everything, all that was in [his] pockets."

(2) Stewart testified that Hardy "snatched" his bag off of his shoulder.

(3) Stewart testified that Hardy aggressively dumped everything out of his bag onto the counter.

(4) Mary Ann Dias testified that she saw Hardy take "everything out of [Stewart's] bag and la[y] it on the counter. Opened it up and took everything out, and then put everything back."

(5) Sylvester Dogan testified that Stewart would "be called over, empty all his pockets, empty all his bags, and—and I guess his contents would be observed and what have you."

(6) In her video-taped deposition, Kelly Koch testified that "[Stewart] would place his bag on the counter. And then they would ask him to unzip and take whatever was inside, out so they could see inside. And then [Stewart] would unzip the top component, and take out whatever was in it. And then they would go ahead and direct him to any other pockets that were in his bag."

Based on this type of evidence, reasonable jurors could find that Hardy intentionally intruded upon the solitude or private affairs or concerns of Stewart and that a reasonable person would find this a highly offensive intrusion, concluding that the searches were done in an unreasonable manner.

### b. *Unlawful reason*

■ Ample evidence was presented that also would permit reasonable jurors to find that Hardy searched Stewart's bag for an unlawful reason, i.e., because he is an African–American. The following are examples of this evidence:

(1) Stewart testified that he "interjected, sprung open a question [to Hardy], so you search us because we're black. And [he] recall[ed] [Mr. Hardy] saying yes."

(2) Mary Ann Dias testified that, prior to Stewart's complaint, she never saw any Caucasian McDonald's employees get their backpacks searched.

(3) In her video-taped deposition, Kelly Koch testified that "I observed that on a normal basis, [Stewart] was being searched almost every evening, and on occasion, certain other minorities were being searched also." She also stated that she never saw Caucasians having their personal bags searched.

(4) Travis Witcher testified that "So the next day I guess they searched everybody or a majority of the blacks, just— they just searched—searched them. There were no—no white associates that day got searched." He also testified that Hardy asked him to open his jacket and patted him down, while Hardy did not search the bag of a white associate who was walking out with Witcher.

(5) Melissa Cates testified that while she worked at the Wal–Mart McDonald's for thirteen months and was only searched three times, a Native American co-worker and acquaintance of hers was stopped and searched many times.

While Hardy testified that his search of Stewart was not motivated by the fact that Stewart was an African–American, a reasonable juror could have found Hardy's testimony not credible. Based on this type of evidence, reasonable jurors could find that Hardy searched Stewart for an unlawful reason, i.e., solely on the basis of his race.

### c. Consent

■ Wal–Mart argues that consent is a defense to an invasion of privacy claim, and that a reasonable juror could not have concluded that the searches of Stewart's bag were anything but consensual. Wal–Mart also asserts that "the evidence showed that Stewart consented to the searches by continuing to carry his bag, because the jury found that Stewart's bag was not searched for the illegal motive of racial basis." Wal–Mart's final point is that "where a legal bag search procedure is in effect, consent is implied."

Stewart argues that his search was not consensual, either because of mistake or duress, and that evidence to that effect was presented at trial. Specifically, Stewart notes that he testified that the first time he was searched he "mistakenly thought that perhaps he was being searched because someone had mistaken him for a shoplifter." Furthermore, Stewart argues that he testified that, at least for the first few searches, he "mistakenly believed that the searches were possibly part of a random nondiscriminatory pattern of searches." Additionally, Stewart asserts that he did not consent to the searches because he was under duress. The duress, Stewart argues, was two-fold; first, he was under duress because he believed that if he did not allow the searches to occur it was "likely that others present ... would have believed that he might be a thief,"; and second, he believed that "if he did not allow himself to be searched that he would be fired and/or that the police would be called."

Reasonable jurors could find that Stewart did not consent to the searches. Not only was there evidence presented that could lead reasonable jurors to conclude that Stewart was mistaken or under duress when he "con-

sented" to the searches, but, as the superior court noted, there was also evidence presented that Stewart never in fact consented. The superior court stated: "On the issue of consent, again there is evidence on both sides that Mr. Stewart essentially voiced his dissent numerous times when he was being searched." Specifically, Stewart did not consent to Hardy's vigorous and overly-thorough searches.

The following are examples of this evidence:

(1) Stewart testified that the first time he was searched he "was thinking [that the reason he was stopped was] race, and [he] was also thinking perhaps there was a mistake somewhere, perhaps someone had described somebody that looked like [him], maybe [they] thought [he] was someone that was stealing from the store."

(2) Stewart testified that he "believed that at that particular time had [he] complained—complained about [the searches], that they would have thought [he] was probably trying to make waves, [he] was probably trying to undermine their system, and that probably [he] would be terminated." He further testified that at that time he could not afford to lose his job.

(3) Stewart testified that "[a]s [he] was protesting the searches, Mr. Hardy said to [him] shut up, I'm not going to argue with you; as long as I'm working, I'm going to search you every night."

Whether consent is implied when a store has a legal bag search policy is irrelevant. Even were we to conclude that a consent is implied when a legal bag search procedure is in effect, Stewart's suit was premised on the notion that he was not searched pursuant to Wal–Mart's legal bag search policy. Rather, Stewart successfully argued at trial that the searches of his bag invaded his privacy because they were done for an unlawful purpose or in an unreasonable manner.

### 2. Intentional infliction of emotional distress

■ "This court has applied the approach set forth in the Restatement (Second)

of Torts to intentional infliction of emotional distress (IIED) claims."[11] The elements necessary for establishing a prima facie case of IIED are: "(1) the conduct is extreme and outrageous, (2) the conduct is intentional or reckless, (3) the conduct causes emotional distress, and (4) the distress is severe."[12] "If reasonable jurors could differ as to whether the evidence adduced at trial would satisfy these elements, the superior court is required to submit the IIED claim to the jury."[13] But before submitting the IIED claim to the jury the court must first make the threshold determination of "whether the severity of the emotional distress and the conduct of the offending party warrant an instruction on [IIED]."[14] This court will overturn the court's threshold determination only if there has been an abuse of discretion.[15]

At trial, the court held that "[w]ith respect to the emotional distress claim there is clearly conduct and there's clearly evidence of conduct that can go to the jury for them to determine whether it was extreme and outrageous."

■ On appeal Wal–Mart argues that "[t]he evidence at the close of Stewart's case on whether defendant's conduct was outrageous ... was insufficient on the emotional distress claim."[16] In support of its assertion, Wal–Mart cites to this court's decision in *Cameron v. Beard.*[17] Wal–Mart claims that in *Beard* "the defendant sexually abused a minor child while a guest in her parents's home." This, Wal–Mart argues, "is an example of the level of wrongful conduct which is outrageous enough to sustain an intentional infliction of emotional distress claim in Alaska." Wal–Mart incorrectly recites both the facts and the holding of *Beard.* While *Beard* addressed claims of IIED, the facts surrounding the claim involved an employee's claims of harassment and forced retirement.[18] In *Beard* this court concluded that activities such as threats and "behind the scenes efforts to collect evidence of disruptive activity by [the employee]" were "sufficiently outrageous to permit recovery for IIED."[19] Thus, *Beard* is potentially germane to the resolution of this case—Wal–Mart's behavior was comparably outrageous to the *Beard* employer's threats and efforts to collect evidence against an employee.

This court's decision in *Beard,* may, however, be relevant to this case for other reasons. In *Beard,* this court held that an employee who "did nothing more than what her job required her to do—supervise and evaluate Beard's performance .... regardless of her motive" could not be liable for IIED.[20] At first glance it appears that *Beard* dictates that this court conclude that it was an abuse of discretion for the superior court to submit the question of IIED to the jury, if Hardy was simply fulfilling his job of assistant manager by searching Stewart's bag, regardless of his racial motives. Such a reading of *Beard,* however, would be overbroad. While Hardy may have been authorized to conduct searches because he was a Wal–Mart assistant manager, Stewart alleges that Hardy singled him out and searched him

11. *Chizmar v. Mackie,* 896 P.2d 196, 208 (Alaska 1995) (citation omitted).

12. *Id.* (quoting *Teamsters Local 959 v. Wells,* 749 P.2d 349, 357 (Alaska 1988)).

13. *Id.* (citation omitted).

14. *Id.* (quoting *Teamsters Local 959,* 749 P.2d at 357).

15. *See id.* at 209 (citation omitted).

16. Additionally, Wal–Mart makes the same argument regarding its motion for a directed verdict on the IIED claim as it did in its appeal of the invasion of privacy claim, i.e., "after the jury rejected the race motive, Stewart's [IIED] claim failed as a matter of law." Again, Wal–Mart incorrectly argues that its motion for a directed verdict was wrongly denied based on the jury's verdict. The superior court, at the time Wal–Mart moved for a directed verdict, needed only to make the threshold determination whether the severity of Stewart's emotional distress and the outrageousness of Wal–Mart's conduct warranted submitting the IIED issue to the jury. This court will review only that determination for an abuse of discretion.

17. 864 P.2d 538 (Alaska 1993).

18. *See id.* at 543–44.

19. *Id.* at 549.

20. *Id.* at 550.

vigorously every night because Stewart is African–American. Such constant, vigorous searches cannot be considered to be "nothing more than what [Hardy's] job required [him] to do."[21]

We conclude that it was not an abuse of discretion for the superior court to make the threshold determination, based on the evidence presented, that Hardy's conduct was sufficiently outrageous, and Stewart's emotional distress was sufficiently severe, to submit the IIED claim to the jury. The following are examples of this evidence:

(1) Stewart testified that Hardy admitted that the reason he searched the people that he did was because they were African–Americans.

(2) Stewart testified that he was told. to empty his pockets, and that Hardy grabbed his duffel bag off of his shoulder.

(3) Numerous witnesses testified that Stewart and other people of color were searched very often, while Caucasians were either allowed to exit the store without being searched or were searched much less frequently.

(4) Stewart testified that the searches "made me feel very dehumanized as an individual, made me feel just totally distraught, totally down, and just affected me so emotionally.... I would say sometime during the course of my employment, employees have come into McDonald's and asked me are you stealing, and I would have to defend my reputation and say no."

(5) Stewart testified that "[a]s [he] was protesting the searches, Mr. Hardy said to [him] shut up, I'm not going to argue with you; as long as I'm working, I'm going to search you every night."

(6) Stewart testified that "after these searches went on, [he] started getting

[severe] headaches" and that he was experiencing pain throughout his body, which he was told by his doctor was being caused by severe stress.

((7) Mary Ann Dias testified that Stewart acted annoyed, upset and very embarrassed when Hardy searched him.

(8) Stewart's psychiatrist, Dr. Alberts, testified that, after the initial interview with Stewart, he found him to be "seriously depressed, [and] very anxious."

(9) Dr. Alberts testified that his "diagnostic impression was that [Stewart] was def—definitely suffering from post[-]traumatic stresses or—with symptoms of depression and anxiety."

### C. The Trial Court's Decision that Wal–Mart Was Not Entitled to a Directed Verdict or a JNOV on the Punitive Damages Claim Was Correct.

Wal–Mart moved for a directed verdict on the punitive damages claim after the close of Stewart's case-in-chief. Additionally, after the jury returned its verdict in favor of Stewart on two of his claims, and found Wal–Mart liable for $50,000 in punitive damages, Wal–Mart moved the court for a JNOV on the punitive damages claim. The court denied both of Wal–Mart's motions.

 "Punitive damages may not be awarded in an action, whether in tort, contract, or otherwise, unless supported by clear and convincing evidence."[22] "To support a claim for punitive damages, 'the plaintiff must prove by clear and convincing evidence that the defendant's conduct was outrageous, such as acts done with malice, bad motive, or reckless indifference to the interests of another.'"[23] We have stated that a showing of malice is not required; however, Stewart must establish that Wal–Mart's conduct "amounted to reckless indifference to the rights of others, and conscious action in deliberate disregard of [those rights]."[24] In

---

21. *Id.*

22. Former AS 09.17.020 (amended 1997).

23. *Chizmar v. Mackie,* 896 P.2d 196, 210 (Alaska 1995) (quoting *Lee Houston & Assocs. v. Racine,* 806 P.2d 848, 856 (Alaska 1991)).

24. *Id.* (quoting *State v. Haley,* 687 P.2d 305, 320 (Alaska 1984)) (alteration in original).

*Chizmar* we stated that "[i]t is well-established that where there is no evidence that gives rise to an inference of actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice, the trial court need not, and indeed should not, submit the issue of punitive damages to the jury." [25] We will not overrule the superior court's threshold determination absent an abuse of discretion.[26]

 Wal–Mart argues that the jury improperly awarded Stewart punitive damages for three reasons: (1) Judge Tan's statement that the evidence presented "clears the hurdle of clear and convincing, but not by much," defies logic because evidence cannot barely be clear and convincing; (2) no reasonable juror "could have inferred from the small amount of opinion evidence which was offered, the outrageousness and reckless conduct that is necessary to support an award of punitive damages in Alaska"; and (3) because the jury ultimately rejected Stewart's racial discrimination claim, "Stewart's evidence of that motive failed to support a punitive damage[s] claim."

### 1. *Directed verdict*

Wal–Mart states that "[i]t defies logic and is a contradiction in terms that evidence can rise to a 'clear and convincing' standard 'but not by much.'" The court's decision to submit the issue of punitive damages to the jury, Wal–Mart contends, is therefore erroneous. Wal–Mart cites no authority for its proposition. Wal–Mart appears to be arguing that the *Chizmar* requirement means that the court needed to be clearly convinced that Stewart was entitled to punitive damages before submitting the question to the jury. That argument is simply incorrect. In making its threshold determination, the superior court needed to determine whether the evidence presented during Stewart's case-in-chief could give rise to an "inference of actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice." [27] If

the superior court so concludes, it should submit the question to the jury. It does not "defy logic" for the superior court to have concluded that the evidence presented by Stewart rises, albeit barely, to a level that would allow a reasonable juror to infer that Wal–Mart acted with actual malice or that its conduct was sufficiently outrageous to be considered equivalent to actual malice.

Based on the evidence outlined in Parts III.B.1 and 2, we conclude that it was not an abuse of discretion for the superior court to submit the question of punitive damages to the jury. Specifically, a reasonable juror could have concluded that Hardy's actions, including conducting racially motivated searches which he did in an aggressive manner, and which continued even after he became aware that he was upsetting Stewart, were sufficiently outrageous to be considered the equivalent of malice.

### 2. *JNOV*

Wal–Mart argues that the superior court erred when it denied its motion for a JNOV because no reasonable juror could have concluded that Wal–Mart acted with malice or that it acted sufficiently outrageously for its conduct to be considered the equivalent of malice. The main thrust of Wal–Mart's argument is as follows: "The jury rejected Stewart's race claim. Absent wrongful conduct based on race, this court need look no further than Stewart's case-in-chief to find that the evidence was not sufficient to support an award of punitive damages on any other conduct." Wal–Mart also argues that "[t]he uncorroborated opinion testimony of a plaintiff is not enough evidence to rise to the clear and convincing standard for punitive damages." Wal–Mart cites no authority for this proposition.

While Wal–Mart's argument that the jury's ultimate rejection of Stewart's civil rights claim proves that the jury rejected his race claim is not nonsensical at the JNOV stage, it

---

**25.** *Id.* (internal quotation marks omitted) (quoting *State Farm Mut. Auto. Ins. Co. v. Weiford*, 831 P.2d 1264, 1266 (Alaska 1992)).

**26.** *Id.* (citing *Bridges v. Alaska Housing Auth.*, 375 P.2d 696, 702 (Alaska 1962)).

**27.** *Hayes v. Xerox Corp.*, 718 P.2d 929, 935 (Alaska 1986) (citation omitted).

is incorrect. The jury did not reject Stewart's race claim. Rather, the jury concluded, based on the special verdict form, that Wal–Mart did not refuse, withhold, or deny Stewart any of Wal–Mart's advantages or privileges. By first finding that Wal–Mart had not denied Stewart an advantage or privilege, the jury never reached the question whether the denial was because of his race. The jury, therefore, need not have conclusively rejected Stewart's claim that the searches were motivated by his race in order to have reached its verdict.

Wal–Mart argues that the court's denial of its motion for a JNOV was in error on other grounds, all of which can similarly be rejected. Wal–Mart asserts that "[m]uch of Stewart's case consisted of his attorney questioning Wal–Mart management about whether or not they could have done a more thorough investigation of Stewart's February 16 complaint of racial harassment." Evidence of failure to properly investigate Stewart's claim, Wal–Mart argues, was scant and clearly not sufficient to justify a punitive damages award. While Stewart did ask Wal–Mart management questions regarding its investigation of Stewart's claim of racial discrimination, such questions were not central to Stewart's argument regarding the outrageousness of Wal–Mart's actions. Rather, most of Stewart's witnesses, including Stewart himself, testified about how the searches were conducted, who was searched, and why the people were searched. Stewart's assertions that Wal–Mart management did nothing to investigate his claims of racial discrimination were merely one aspect of the entire case.

 We conclude that reasonable jurors could find that Wal–Mart's acts were sufficiently outrageous to warrant a grant of punitive damages. "We will overturn an award of punitive damages only if consideration of the record as a whole leaves us with a firm conviction of error and the need to intervene to prevent a miscarriage of justice."[28] The

testimony set out in Parts III.B.1 and 2 could have been considered by reasonable jurors in concluding that Wal–Mart's "conduct ... was the result of malicious or hostile feelings towards ... Stewart, or was undertaken with reckless indifference to his interest or rights and was outrageous."

D. *The Jury Instructions Were Not Plainly Erroneous.*

 Stewart sued Wal–Mart on three separate legal theories: his statutory right to be free from racial discrimination in the workplace; invasion of privacy; and IIED. The trial court instructed the jury that these three claims were independent. The court stated that:

> Plaintiff claims that he suffered damages when an employee of Wal–Mart searched his person and his bags . . . .

> The plaintiff's claim is based upon three separate theories. These theories are:

> 1) Violation of civil rights;
> 2) Intentional infliction of emotional distress;
> 3) Invasion of privacy;

> . . . In order to recover, plaintiff must establish the elements of at least one of these theories by a preponderance of the evidence.

Both parties agreed to these jury instructions. Because Wal–Mart failed to object to the trial court's jury instructions, this court will review the jury instructions only for plain error. "Plain error occurs if a jury instruction creates a high likelihood that the jury will follow an erroneous theory resulting in a miscarriage of justice."[29] "[T]he 'ultimate determination in analyzing plain error in jury instructions is simply whether a correct instruction would have likely altered the result.'"[30] On appeal, Wal–Mart argues that "Judge Tan committed plain error by allowing a special verdict form or instructions which did not make clear that if Stew-

**28.** *Johnson & Higgins of Alaska Inc. v. Blomfield,* 907 P.2d 1371, 1376 (Alaska 1995) (citation omitted).

**29.** *Zok v. State,* 903 P.2d 574, 577 (Alaska 1995) (quoting *Conam Alaska v. Bell Lavalin, Inc.,* 842

P.2d 148, 153 (Alaska 1992) (internal quotation marks omitted)).

**30.** *Matter of Estate of McCoy,* 844 P.2d 1131, 1134 (Alaska 1993) (quoting *Conam Alaska,* 842 P.2d at 153).

art's race claim failed, his invasion of privacy and intentional infliction of emotion distress claim also failed, absent sufficient evidence of an unlawful purpose for searching Stewart's bag." Furthermore, Wal–Mart argues, "because the jury rejected Stewart's claim of a racial motive for searching Stewart's bag, the court should not have allowed the jury to find that the bag searches were highly offensive such that they constituted an invasion of his privacy or an intentional infliction of emotional distress." This is because, Wal–Mart claims, "[t]here was simply no evidence of any 'illegal' intrusion."

■ Wal–Mart also argues that the jury's verdict was inconsistent and fundamentally flawed. Wal–Mart failed to raise its claim that the jury's verdict was inconsistent before the jury was dismissed; therefore, this court should not entertain Wal–Mart's argument on appeal.[31] Because Wal–Mart failed to challenge the consistency of the verdict before the jury was discharged, it "consequently waived [its] right to challenge the verdict's consistency."[32]

We are not persuaded that it was reversible error for the trial court not to instruct the jury that, absent a finding that Wal–Mart denied Stewart an advantage or privilege, the jury could not find that Wal–Mart was liable to Stewart for damages resulting from an unreasonable invasion of privacy or IIED.

The court instructed the jury separately as to each of the three counts. Instruction No. 10 states:

> In this case, the plaintiff claims that his civil rights were violated by one or more defendants. In order to recover, plaintiff must establish by a preponderance of the evidence that:
>
> 1) One or more defendants refused, withheld, or denied plaintiff any of Wal–Mart's advantages or privileges, and,
>
> 2) One or more defendants did so because of plaintiff's race or color.

The court further instructed the jury on the necessary requirements for finding IIED and invasion of privacy. Wal–Mart does not assert that the individual instructions for the three separate claims were plainly erroneous. Rather, Wal–Mart contends that it was plain error for the court not to instruct the jury that, absent a finding that Wal–Mart denied Stewart any of its advantages or privileges because of his race, the jury could not conclude that Wal–Mart is liable for IIED or invasion of privacy.

Wal–Mart's argument is unpersuasive. Wal–Mart is seemingly arguing that the jury answering "no" to the question whether Wal–Mart denied Stewart a right or privilege forecloses the issue of race as a factor in the bag searches. Furthermore, Wal–Mart argues that "the jury was not provided with sufficient explanation to let it understand that if race was not the motive for the bag searches then there had to be sufficient evidence of another illegal motive or method in order to find liability as to the other causes."

As discussed above, what Wal–Mart fails to recognize is that by concluding that Wal–Mart did not deny Stewart a privilege or advantage, the jury did not necessarily also conclude that race was not a factor in the bag searches. Furthermore, even if this court adopts Wal–Mart's assumption that the jurors concluded that race was not a factor in the bag searches, the jury would not thereby be precluded from concluding that Stewart proved his claims of IIED and invasion of privacy by a preponderance of the evidence. The court properly instructed the jury on the elements of IIED and invasion of privacy; if the jury concluded that race was not a reason for the bag searches, it could nevertheless conclude that Wal–Mart was liable for these claims. As discussed above, there was evidence presented from which reasonable jurors could conclude that Stewart had met the necessary requirements for IIED, invasion of privacy, and punitive damages.

We conclude that it was not plain error for the superior court to instruct the jury that

---

**31.** *See Zok,* 903 P.2d at 577 ("We have held that challenges to the consistency of a verdict must be made prior to the discharge of the jury.") (citations omitted).

**32.** *Id.*

the suit consisted of three separate claims and that the jury could conclude that Wal–Mart was liable for IIED and invasion of privacy without concluding that Wal–Mart denied Stewart a right or a privilege.

E. *None of the Superior Court's Evidentiary Decisions Were an Abuse of Discretion.*

Wal–Mart appeals numerous evidentiary rulings. It argues that the superior court made several errors, and that "the combined effect of those errors should be enough to warrant reversal of punitive damages in a case such as this where even the judge admitted that the plaintiff 'barely' met the clear and convincing standard to withstand a motion for a directed verdict." Wal–Mart appeals the court's rulings admitting the following evidence: (1) allowing Stewart to impeach Hardy with information from Hardy's personnel file, when the court had already ruled that the personnel file contained no discoverable information; (2) allowing "numerous incidents of further unrelated 'prior acts' testimony about Hardy"; and (3) allowing in evidence of a prior lawsuit against Wal–Mart which existed at the time Divis was a store manager.

 Wal–Mart waived most of the evidentiary rulings that it now appeals because it failed to raise the proper objections during the trial.[33] First, Wal–Mart conceded that Hardy's personnel file could be used for impeachment purposes. The superior court ruled that there was nothing in the personnel file that was discoverable. Stewart clarified that he still wanted to impeach Hardy with it. The court agreed that he could do so. Wal–Mart did not object. Additionally, when Stewart actually used information from the personnel file to impeach Hardy, Wal–Mart did not object. Second, Wal–Mart stipulated that the court would instruct the jury that there was a lawsuit filed on February 6, 1995, and that it was served on Wal–Mart's corporation. Wal–Mart cannot now appeal the court's permitting Stewart to mention the prior lawsuit. On appeal, Wal–Mart at-

tempts to characterize the discussion surrounding its stipulation as an objection; however, it defies logic for Wal–Mart to argue that it simultaneously objected and stipulated to the admission of this evidence. Third, Wal–Mart argues that

[Travis] Witcher testified about a totally unrelated incident where Witcher believed Hardy "coached" or disciplined him when he didn't deserve it. That incident had nothing whatever to do with searches or racial matters, so was also totally irrelevant, and was pure disparagement of Hardy's character in violation of Evidence Rules 403 and 404.

Wal–Mart did not object to Witcher's testimony at trial, and therefore has waived any objection on appeal. Fourth, Wal–Mart appeals the superior court's admission of Witcher's testimony about a racially discriminatory comment Witcher overheard Hardy make about a Native–American man. Again, Wal–Mart did not object to Witcher's testimony during the trial. Lastly, Wal–Mart appeals the admission of Witcher's testimony about inter-racial marriages. Wal–Mart objected at first on hearsay grounds to the way the testimony was being presented; the court sustained that objection. However, Wal–Mart raised no objection to the content of the testimony once Stewart rephrased the form of the question.

 While Wal–Mart's appeal of the other evidentiary ruling was raised at trial, the ruling was not an abuse of the court's discretion. Wal–Mart argues that allowing Stewart to ask the following question: "Does [Hardy]—when he has his slack time during work shift does he tend to chit-chat equally with women as he does with men or does he seem to chit-chat more with the men than the women?" was an abuse of discretion because the "line of questioning . . . was an attempt to elicit irrelevant and prejudicial character evidence." Wal–Mart objected to the question on relevance grounds. On appeal, Wal–Mart asserts that the question was an attempt by Stewart to "infer that Hardy practiced sex discrimination." Stewart, however,

**33.** *See Williams v. Utility Equip., Inc.,* 837 P.2d 1112, 1116–17 (Alaska 1992) (holding that the party "waived his objections . . . when he did not make specific objections as the testimony was presented") (citation omitted).

argues that the question "sought to demonstrate that, as a woman, [the witness] might not have as complete and as accurate of an insight on Hardy's attitude as would men co-workers." The record supports Stewart's characterization of the question.

Q: How well do you know Randy Hardy?

A: Pretty well. I worked with him a lot.

Q: Do you have any idea what his racial attitudes are towards black people?

A: I've never heard him say, comment or do anything about it.

Q: Uh-huh. Does he—when he has his slack time. . . .

None of the superior court's evidentiary rulings were an abuse of discretion.

F. *The Superior Court Did Not Err When it Failed to Excuse a Potentially Conflicted Juror.*

 During Stewart's testimony, juror Hostman alerted the court that he recognized a name (Ben Smith) being discussed by one of the witnesses. Hostman stated that Smith, a McDonald's employee who worked with Stewart, was a "close associate" of his. Hostman also said that Smith had complained about some of the McDonald's management to him. When asked whether he would have a problem deciding the case on the evidence presented at trial, he answered no. Both Stewart and Wal–Mart asked Hostman a few questions. The court decided to keep Hostman on the jury. Neither Stewart nor Wal–Mart objected to the court's decision.

On appeal Wal–Mart attempts to characterize its questioning of Hostman as an objection. Wal–Mart states that "counsel expressed her objection that, 'My concern is that just as the trial goes on, more and more

is going to begin to come to you and it'll be more difficult for you to separate it.' The juror said it would not be a problem for him. Judge Tan erroneously decided to keep him on the jury." Wal–Mart's "objection" was merely part of counsel's questioning of Hostman. When the court made the decision to keep Hostman on the jury, Wal–Mart expressed no objection to the court. Wal–Mart waived any objection to Hostman remaining on the jury by failing to challenge the juror at trial, and cannot now appeal the court's decision.[34] In the alternative, Wal–Mart argues that it was plain error for the court not to dismiss Hostman as a juror. Hostman stated that he would be able to decide the case based solely on the evidence presented at trial, that he would not have a problem refraining from discussing his personal knowledge in the jury room, and that he would not have a problem keeping separate his personal issues from the issues presented in this case. It was not plain error for the court to allow Hostman to remain on the jury.

## IV. CONCLUSION

We conclude that the superior court properly denied Wal–Mart's motions for a directed verdict and a JNOV. It did not abuse its discretion in any of its evidentiary rulings. Wal–Mart waived its right to appeal numerous evidentiary rulings and the court's decision to leave Hostman on the jury. The jury instructions were not plain error. We AFFIRM the judgment of the superior court.

---

34. *See Murray v. Feight,* 741 P.2d 1148, 1156–57 (Alaska 1987) (stating that when no objection is raised at trial, any errors claimed on appeal must be reviewed only if they constitute plain error).